131 F.3d 610
 122 Ed. Law Rep. 943
 MARIE O., Gabriel C. and Kyle G., et al., by their parents
and legal guardians, individually, and on behalf
of all other similarly situated
individuals, Plaintiffs-Appellees,
v.
Jim EDGAR, Governor of Illinois, and Joseph H. Spagnolo,
State Superintendent of Education, Defendants-Appellants.
 No. 96-3609.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 9, 1997.
Decided Dec. 2, 1997.
 
 Richard L. Fenton, Jill Thompson Calian, David E. Lieberman, Sonnenschein, Nath & Rosenthal, Maria Woltjen, Karen M. Berman (argued for Marie O.), Amy Zimmerman, Chicago Lawyers' Committee for Civil Rights Under Law, Chicago, IL, for Plaintiffs-Appellees.
 Thomas A. Ioppolo, Office of the Attorney General, A. Benjamin Goldgar (argued for James R. Edgar), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendants-Appellants.
 Thomas E. Chandler, Jessica Dunsay Silver, Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for Amicus Curiae.
 Before CUDAHY, RIPPLE and KANNE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Four infants with disabilities filed a class action suit alleging that the State of Illinois was not complying with the Individuals with Disabilities Education Act ("IDEA"). These plaintiffs sought declaratory and injunctive relief to achieve recognition of their rights under the IDEA and to require the Governor and State Superintendent of Education of Illinois to bring Illinois into compliance with the IDEA. Upon cross-motions for summary judgment, the district court granted the plaintiffs' motion and subsequently entered a judgment providing declaratory and injunctive relief. For the reasons set forth in the following opinion, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 Four infants with disabilities brought this action on behalf of themselves and a class of approximately 26,000 other children in Illinois who are eligible for, but not receiving, early intervention services, allegedly in violation of Part H of the IDEA, 20 U.S.C. §§ 1471-85.[1] The IDEA has evolved from what was originally the Education of the Handicapped Act ("EHA"), enacted by Congress in 1970. In 1986, the EHA was supplemented by the addition of Part H, which was established to address the needs of infants with disabilities. In 1990, the EHA was renamed the Individuals with Disabilities Education Act; the portion of the IDEA pertaining specifically to infants with disabilities continued to be referred to as Part H.
 
 
 4
 Part H sets up a federal program by which federal funds are granted to states for the development and implementation of systems to provide early intervention services to developmentally-delayed infants and toddlers from birth through age two. The law was enacted because Congress perceived, among other needs, an "urgent and substantial need ... to enhance the development of infants and toddlers with disabilities and to minimize their potential for developmental delay." 20 U.S.C. § 1471(a)(1).[2] In order for states to receive federal funds under Part H, the states are required to establish a comprehensive early intervention system to assist children with disabilities from birth through age two.[3] Part H contains specific guidelines detailing the parameters of the statewide system, including the types of services such a system must provide.[4]
 
 
 5
 Part H allows a state to increase incrementally its participation in the program. Specifically, Part H requires assurances from the state, as it applies for its fifth year of funding, that the state has in effect the statewide system providing for early intervention services. See 20 U.S.C. §§ 1475(c), 1476(a). The statute provides that the state must file an application providing "information and assurances demonstrating to the satisfaction of the Secretary [of Education] that the State has in effect the statewide system required by section 1476 of this title and a description of services to be provided." 20 U.S.C. § 1475(c). In turn, § 1476 provides that a "statewide system of coordinated, comprehensive, multidisciplinary, interagency programs providing appropriate early intervention services to all infants and toddlers with disabilities and their families ... shall include the minimum components under [sec. 1476(b) ]." 20 U.S.C. § 1476(a). Excluding subparts, there are 14 minimum required components of the statewide system under § 1476(b).[5] Among these is a requirement that the statewide system shall include "timetables for ensuring that appropriate early intervention services will be available to all infants and toddlers with disabilities in the State." 20 U.S.C. § 1476(b)(2). In addition, other sections of Part H further explicate the details of those required components of the statewide system.[6]
 
 
 6
 The State of Illinois began participating in the Part H program in 1987, and since then has received in excess of $34 million in federal funds for use in planning and implementing its statewide system of early intervention services. In September, 1991, Illinois enacted the Illinois Early Intervention Services Systems Act ("Illinois Act") which formally established an early intervention system in the state. Although Illinois began its fifth year of participation in the Part H program in December, 1992, the Illinois Act did not contemplate full implementation of a statewide service system until 1996. Despite its violation of the IDEA's provision requiring full implementation of the statewide system by the fifth year of participation, Illinois still applied for, and was granted, funds under Part H from the federal government.
 
 
 7
 In 1993, the Auditor General of Illinois reviewed the state's progress in implementing its statewide system and compiled a report regarding the status of the early intervention program. The report indicated that services were not available in all parts of the state, many eligible children were not being served and were on waiting lists, some federal and state program components were not fully implemented and no tracking or other follow-up was being conducted. The defendants, throughout the proceedings, have not challenged the plaintiffs' allegation of Illinois' lack of complete compliance with the elements of Part H. Instead, they have argued predominantly that plaintiffs cannot bring an action against them, both because the action is barred by the Eleventh Amendment and because Part H does not create rights that may be enforced by private parties in an action under 42 U.S.C. § 1983.
 
 
 8
 The named representatives of the plaintiff class are four children with disabilities who were placed on waiting lists. They brought suit on behalf of the class of eligible but unserviced infants and sought declaratory and injunctive relief. The declaratory relief they requested was for the district court to declare that Illinois' failure to provide all eligible infants with early intervention services under Part H was a violation of their rights under Part H. Correspondingly, the injunctive relief requested was for the district court to require Illinois, through its Governor and Superintendent of Education, to provide early intervention services to all eligible children and, in so doing, to comply with the mandatory aspects of Part H.
 
 B. District Court's Decision
 
 9
 On June 13, 1994, the district court denied the defendants' motion to dismiss the complaint. It determined that this action was not barred by the Eleventh Amendment because it falls under the Ex parte Young exception. The court held that, because plaintiffs were seeking prospective injunctive relief, the fact that Illinois possibly would have to spend considerable funds to comply with Part H did not remove the action from the strictures of the Ex parte Young doctrine. On February 1, 1996, with cross-motions for summary judgment before it, the district court decided to grant the plaintiffs' motion. In its decision, the district court held that plaintiffs had a cognizable claim under 42 U.S.C. § 1983 to enforce their rights pursuant to Part H of the IDEA, 20 U.S.C. §§ 1471-85. The district court further determined that Part H requires that, "after five years, a state 'shall' have in effect 'at a minimum' certain programs serving 'all' eligible children." R.58 at 18. Nevertheless, in framing relief, the district court found that the "practicalities of the situation" prevented its employing a "strict reading of the term 'all.' " Id. at 17-18. The court therefore granted plaintiffs the requested declaratory relief, stating that (1) Illinois was required to have in place a statewide system of programs providing early intervention services to all eligible infants, and (2) Illinois was required to provide the services mandated under Part H. The district court also granted detailed injunctive relief designed to require the defendants to bring Illinois into "meaningful compliance" with Part H.[7]
 
 II
 DISCUSSION
 A. Eleventh Amendment
 
 10
 On appeal, the defendants renewed their claim that the plaintiffs' action is barred by the Eleventh Amendment of the Constitution of the United States.[8] Although the Eleventh Amendment generally has been interpreted to divest federal courts of subject matter jurisdiction over suits brought by private parties against a state, three exceptions to the constitutional bar exist. First, suits against state officials seeking prospective equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment under the Ex parte Young doctrine. See Ex parte Young, 209 U.S. 123, 159-60, 28 S.Ct. 441, 453-54, 52 L.Ed. 714 (1908). Second, individuals may sue a state directly if Congress has abrogated the state's immunity from suit through an unequivocal expression of its intent to do so and pursuant to a valid exercise of its power. See Seminole Tribe of Florida v. Florida, 517 U.S. 609, ----, 116 S.Ct. 1114, 1123, 134 L.Ed.2d 252 (1996). Finally, individuals may avail themselves of suits against a state that has properly waived its sovereign immunity and consented to suit in federal court. See id. at ---- - ----, 116 S.Ct. at 1122-23; Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985). We believe that, in this case, the first exception controls.
 
 1.
 
 11
 In denying the defendants' Rule 12(b)(1) motion to dismiss that was based in part on the ground that the suit was barred by the Eleventh Amendment, the district court determined that it had jurisdiction because the plaintiffs' action falls under the Ex parte Young doctrine. The Governor and State Superintendent of Education of Illinois assert that the district court erred in holding that the doctrine was applicable in this case. They contend that the Supreme Court's decision in Seminole Tribe circumscribed the scope of the Ex parte Young doctrine because the Court stated that, "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon Ex parte Young." Seminole Tribe, 517 U.S. at ----, 116 S.Ct. at 1132. The defendants maintain that Part H contains such a detailed remedial scheme, and that therefore the district court erred when it substituted its jurisdiction for the remedial scheme established by Congress. Relatedly, the defendants argue that, because the remedial scheme provided under Part H is less rigorous than the remedies available in federal court proceedings, allowing resort to federal court in this case is contrary to Congress' intent in creating Part H's remedial scheme. We are not convinced that the district court's decision that this case falls under the Ex parte Young doctrine is contrary to Seminole Tribe; therefore, we hold that the Eleventh Amendment did not bar the jurisdiction of the district court over this matter.
 
 
 12
 In Seminole Tribe, the Seminole Tribe of Indians in Florida sued the Governor and State of Florida. It alleged a violation of the Indian Gaming Regulatory Act's ("IGRA") requirement that Florida negotiate in good faith to enter into a "Tribal-State compact governing the conduct of gaming activities." See Seminole Tribe, 517 U.S. at ----, 116 S.Ct. at 1120 (quoting 25 U.S.C. § 2710(d)(3)(A)). Such a compact was mandated under the IGRA in order for the Seminole Indians to conduct lawfully various gaming activities, including slot machines, casino games, dog racing, lotteries and others. See id. at ---- - ----, 116 S.Ct. at 1119-20. The IGRA contained specific remedial provisions allowing resort to federal court in the event a state violated its duty to negotiate in good faith. The district court's role in resolving such a dispute is substantially limited under the IGRA.[9] Consequently, the Supreme Court held that the Seminole Indians could not bring an action against the Governor of Florida to force the state "into compliance with § 2710(d)(3)" under the Ex parte Young doctrine. Id. at ----, 116 S.Ct. at 1132. Specifically, it determined that, in contrast with the "modest set of sanctions" provided under the IGRA, "an action brought against a state official under Ex parte Young would expose that official to the full remedial powers of a federal court." Id. at ----, 116 S.Ct. at 1133. The Court stated that, if the pertinent section of the IGRA could be enforced in federal court under Ex parte Young, it would render the remedial provision of the IGRA "superfluous." Id. In addition, the Court was concerned about permitting a suit against a state official in that context in light of the IGRA's focus on "the State." Id. at ---- n. 17, 116 S.Ct. at 1133 n. 17. Because no relevant duties under the IGRA were reposed in a state official, the Court was reluctant to allow the Ex parte Young action against the Governor to go forward.
 
 
 13
 The situation before us is significantly different from the one in Seminole Tribe. At the outset, we note that the type of action brought by the plaintiffs is squarely within the traditional bounds of the Ex parte Young doctrine as reaffirmed in Seminole Tribe.[10] The plaintiffs brought an action against two state officials seeking prospective equitable relief for ongoing violations of federal law. In contrast with Seminole Tribe, here there is no explicit remedial scheme that provides only limited redress in federal court for the type of violation at issue. In Seminole Tribe, the IGRA's remedial scheme expressly provided the method of judicial redress for violations of the provision of the IGRA that the Seminole Tribe was seeking to enforce. The role of the court was limited specifically by statute. Thus, the Court determined that allowing an Ex parte Young action to circumvent that limited remedial scheme, thereby exposing state officials to the "full remedial powers of a federal court," would have rendered superfluous the statutory remedy under the IGRA. In this case, the remedial measures do not expressly limit the role of the district court in redressing complaints concerning the failure of a state to implement the mandatory aspects of Part H. In fact, to the extent the matter is addressed, Part H indicates that a district court "shall grant such relief as [it] determines is appropriate." 20 U.S.C. § 1480(1).[11] Therefore, one of the main reasons that the Court refused to allow an Ex parte Young action in Seminole Tribe is inapplicable here.
 
 
 14
 Part H also differs from the IGRA in another respect that was significant in the Court's analysis in Seminole Tribe. Whereas the IGRA imposed the duty to negotiate on "the State," Part H, by contrast, imposes significant duties on individual state executive officers, including the Governor.[12] The Court in Seminole Tribe noted that the duty imposed on the state by the IGRA to negotiate in good faith to enter into a "compact with another sovereign--stands distinct in that it is not of the sort likely to be performed by an individual state executive officer or even a group of officers." Seminole Tribe, 517 U.S. at ---- n. 17, 116 S.Ct. at 1133 n. 17. Because the duties were imposed by the IGRA on the state, the Court was reluctant to allow a suit against a state officer--the Governor of Florida--under the Ex parte Young doctrine. In contrast, Part H imposes upon state officers important responsibilities. We conclude that a suit against them seeking to enforce compliance with the federal program under which they have accepted funds is cognizable under the Ex parte Young doctrine.[13]
 
 2.
 
 15
 The Supreme Court, in Dellmuth v. Muth, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989), held that there was no abrogation of state sovereign immunity under the IDEA (then the EHA) because that law "makes no reference whatsoever to either the Eleventh Amendment or the States' sovereign immunity." Id. at 231, 109 S.Ct. at 2402. In response, Congress added § 1403 to the IDEA in October, 1990. Section 1403(a) of the IDEA provides that a "State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter."[14] 20 U.S.C. § 1403(a).
 
 
 16
 Because we decide this issue under the Ex parte Young doctrine, we need not decide definitively whether § 1403 might be characterized appropriately as a waiver of the recipient state's immunity under the Eleventh Amendment. The defendants seek to characterize the section as one of congressional abrogation; they then argue that the Court's rationale in Seminole Tribe, validating only those abrogations that Congress effects through the Fourteenth Amendment, invalidates any abrogation of state immunity under Part H. In arguing in favor of waiver, the plaintiffs urge that, because Illinois intentionally availed itself of funds under Part H, it has accepted the IDEA's terms. In Seminole Tribe, the Supreme Court explicitly left intact the "unremarkable, and completely unrelated [to abrogation], proposition that the States may waive their sovereign immunity." Seminole Tribe, 517 U.S. at ----, 116 S.Ct. at 1128. Congress may condition receipt of federal funds on a waiver of a state's immunity under the Eleventh Amendment. See Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 3145 n. 1, 87 L.Ed.2d 171 (1985).
 
 
 17
 The Supreme Court also has held that, to effectuate a waiver of Eleventh Amendment immunity through a state's conditional acceptance of federal funds, Congress must express, unambiguously, its intent to impose such a condition on the state. "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539-40, 67 L.Ed.2d 694 (1981). Here, the text of the statute does not speak in terms of waiver or of abrogation. However, Congress also included as a caption to this section "Abrogation of State sovereign immunity." 20 U.S.C. § 1403. The legislative history of the section reveals, moreover, that this choice of language was a conscious one. The original bill in the House of Representatives employed the word "abrogation." See H.R. Conf. Rep. No. 101-787, at 55 (1990), reprinted in 1990 U.S.C.C.A.N. 1784, 1787. The Senate version contained the word "waiver." Id. In the Conference Committee, the Senate receded to the House version. Id. When Congress revisited the IDEA in 1997 in an explicit effort "to reauthorize and make improvements," H.R.Rep. No. 105-95, at 1 (1997), reprinted in 1997 U.S.C.C.A.N. 78, 78, it did not change the term "abrogation" despite the advent of the Supreme Court's decision in Seminole Tribe. Congress' failure to delete the term "abrogation" in the wake of Seminole Tribe might well indicate that it views the statutory section as a waiver provision. This conclusion seems especially appropriate when we recall that Congress initially enacted the section to ensure that the Eleventh Amendment would not prevent individual beneficiaries from vindicating their rights under a statute requiring state adherence to federal standards as a prerequisite for federal funding.[15] More fundamentally, we ought not assume that, in enacting legislation "to reauthorize and make improvements," id., Congress would fail to conform the statute to the Court's holding in Seminole Tribe. The courts "presume that Congress expects its statutes to be read in conformity with [the Supreme] Court's precedents." United States v. Wells, --- U.S. ----, ----, 117 S.Ct. 921, 929, 137 L.Ed.2d 107 (1997). Nevertheless, this problem is a regrettable one and we urge that the appropriate legislative steps be taken to achieve the clarity necessary to ensure effective governance.
 
 
 18
 Because we need not resolve, in this case, whether the historical context of this provision and the existence of the problematic caption with the word "abrogation" destroy the requisite clarity needed for a waiver of Eleventh Amendment immunity, we shall not address the other objections which the defendants have raised to the possibility of waiver of Eleventh Amendment immunity.[16]
 
 B. IDEA Rights Enforceable under § 1983
 
 19
 We next shall examine whether the plaintiffs' claim can be brought under 42 U.S.C. § 1983. In City of Chicago v. Lindley, 66 F.3d 819, 823-24 (7th Cir.1995), we had occasion to set forth the standards that govern such an inquiry. Those standards, refined and reinforced by the Supreme Court's recent pronouncement in Blessing v. Freestone, --- U.S. ----, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), govern our analysis today.
 
 
 20
 In Maine v. Thiboutot, 448 U.S. 1, 6-8, 100 S.Ct. 2502, 2505-06, 65 L.Ed.2d 555 (1980), the Supreme Court announced the watershed rule that litigants may rely on § 1983 to challenge violations of federal statutes. Later cases soon made clear, however, that this general rule was subject to substantial qualification. Section 1983 is cast in terms of "rights, privileges, or immunities" rather than in terms of all violations of federal law; therefore, a plaintiff must show that the particular federal statute at issue creates specific rights. See Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 106, 110 S.Ct. 444, 448-49, 107 L.Ed.2d 420 (1989). Absent such enforceable rights, a cause of action under § 1983 is not available. See Suter v. Artist M., 503 U.S. 347, 356, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992). Moreover, even if the federal statute in question does create such enforceable rights, a cause of action under § 1983 cannot be sustained if the statute specifically forecloses a remedy under § 1983. See Golden State Transit Corp., 493 U.S. at 106, 110 S.Ct. at 448-49; Smith v. Robinson, 468 U.S. 992, 1005 n. 9, 104 S.Ct. 3457, 3465 n. 9, 82 L.Ed.2d 746 (1984).
 
 
 21
 In the defendants' view, a cause of action under § 1983 cannot be maintained in this case because Part H does not create enforceable rights, privileges or immunities and because Congress has foreclosed enforcement of Part H in the enactment itself. We shall examine each of these contentions.
 
 1. Enforceable Rights
 
 22
 The Supreme Court has distilled a three-part inquiry for the lower courts to follow when they must decide whether a particular federal statute creates a right enforceable under § 1983:(1) whether the plaintiff is an intended beneficiary of the statute; (2) whether the plaintiff's asserted interests are not so vague and amorphous as to be beyond the competence of the judiciary to enforce; and (3) whether the statute imposes a binding obligation on the state. See Blessing, --- U.S. at ----, 117 S.Ct. at 1359; Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990). Here, the defendants focus on the last of these inquiries. We hasten to point out, however, that there is a significant overlap between the second and third.
 
 
 23
 In Blessing, the Supreme Court reemphasized the appropriate methodology. --- U.S. at ---- - ----, 117 S.Ct. at 1360-61. To determine whether the requirements of Part H create enforceable rights, we must "examine exactly what is required of States by the Act." Suter, 503 U.S. at 358, 112 S.Ct. at 1367-68. We must also take "pains to analyze the statutory provisions in detail." Id. at 357, 112 S.Ct. at 1367. Here, the parties agree that Part H was intended to benefit the plaintiffs. We therefore limit our examination to whether Part H imposes a binding obligation on the state and to whether the interests asserted by plaintiffs are so vague and amorphous that they are beyond the competence of the judiciary to enforce. See Wilder, 496 U.S. at 509-10, 110 S.Ct. at 2517-18.
 
 
 24
 In the view of the defendants, the requirements of Part H do not create any specific rights in the plaintiffs. They contend that Illinois' only obligation is to submit an application with assurances to the Secretary that a statewide system is in place as of the fifth year of participation. The defendants further argue that Illinois has considerable discretion in determining how to set up its system, and that there are no specific timetables for the components of the system to be in place. Under these circumstances, they continue, it cannot be said that Congress gave the plaintiffs any specific rights to enforce under § 1983. Turning to the text of the statute, the defendants note that § 1475(c), the provision requiring the statewide system at the five-year point, does not say specifically that Illinois has to serve "all" children. They further allege that, although § 1476, which does contain the term "all," outlines the components of the statewide plan, it does not require specifically that all children must be served by a state's fifth year of participation. In the defendants' view, therefore, states have broad discretion to determine how they will implement their programs under Part H. Given this discretion, including the authority to define who is eligible for services, exactly what services children will receive and which children will be eligible to receive them, the defendants assert that Part H is too vague to be enforced by § 1983.
 
 
 25
 We cannot accept this view of the statutory scheme. Rather, we agree with the district court, and the United States as amicus curiae, that the language of Part H is mandatory and clear and therefore creates rights enforceable by individuals. Read as a whole, Part H requires that, by the fifth year of its participation, Illinois must have in place a statewide system. See 20 U.S.C. § 1475(c). That system "shall include" 14 minimum components. Some of these components create specific rights because they include specific services that eligible children are entitled to receive, including the right (1) to be identified and referred for help, (2) to receive a multidisciplinary evaluation and (3) to receive an individual family service plan ("IFSP") specifying services the child will receive. See 20 U.S.C. §§ 1476(b)(3)-(5). Regulations accompanying Part H provide additional details regarding the timelines for these services.[17] For example, under Part H, Illinois must have a system to locate all children who are eligible to receive early intervention services. See 20 U.S.C. § 1476(b)(5); 34 C.F.R. § 303.321. The regulations require that, once identified, the child must be referred to a public agency within two working days. See 34 C.F.R. § 303.321(d)(2)(ii). Furthermore, the regulations provide that the child must receive his or her evaluation and written IFSP within 45 days. See 34 C.F.R. §§ 303.321(e)(2), 303.342(a). There is no ambiguity here; we do not find any of these requirements to be so vague or unclear as to be unenforceable. It is clear that Congress intended to require the states to undertake specific and concrete obligations to eligible individuals in exchange for the federal funds granted under Part H.
 
 
 26
 The statute is specific not only with respect to the services that are to be provided but also with respect to the beneficiaries of those services. Section 1476 states that the statewide program providing services to "all infants and toddlers with disabilities ... shall include ... timetables for ensuring that appropriate early intervention services will be available to all infants and toddlers with disabilities in the State ... before the beginning of the fifth year." 20 U.S.C. §§ 1476(a) & (b)(2) (emphasis supplied). "All" is unambiguous; it means every eligible child. In addition, the statutory language regarding state plans is direct; it uses "shall" and "required." The regulations use the word "must." The natural meaning of these terms is mandatory, not precatory. See Blessing, --- U.S. at ----, 117 S.Ct. at 1359.
 
 
 27
 As the record demonstrates, the federal agency charged with the administration of the statute, appearing here through the United States as amicus curiae in support of affirmance, has long maintained that the state has specific obligations to the individuals who now come before us as plaintiffs seeking enforcement of their rights. Policy memoranda from the agency in charge of implementing this federal program, the United States Department of Education, make clear that all eligible children are entitled to receive early intervention services.[18] The statutory language is not only clear and specific; it is mandatory.
 
 
 28
 We encounter here none of the vagueness that caused us to determine that the rights asserted in City of Chicago v. Lindley, 66 F.3d 819 (7th Cir.1995), could not be enforced. Here, the statute spells out the specific identity of the recipients and the specific services to which they are entitled. Moreover, the obligation of the state according to the clear statutory language is to provide the services, not to make the "reasonable efforts" that rendered the rights asserted in Suter unenforceable. As the United States as amicus curiae notes, the statute at issue here does not simply require the "substantial compliance" that was deemed problematic in Blessing. Here, the statute requires compliance.
 
 2. Section 1983 Enforcement Not Precluded
 
 29
 The defendants submit that, even if Part H does create enforceable rights, the statute itself creates a remedial scheme that is sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of suits under § 1983. In their view, Congress set forth detailed procedural safeguards in order to provide for the enforcement of Part H. Primary enforcement authority is invested in the Secretary, except when parents are aggrieved by administrative resolution of their complaints; nowhere in Part H is there a provision for federal court supervision of the states. Given such an extensive scheme, they contend, Congress impliedly foreclosed other enforcement avenues.
 
 
 30
 Neither the text nor the structure of the statute will sustain the defendants' argument. Congress certainly did not foreclose explicitly recourse to § 1983. Nor have the defendants met the "difficult showing," Blessing, --- U.S. at ----, 117 S.Ct. at 1362, that allowing an action under § 1983 is inconsistent with Part H's remedial scheme. Although the Secretary has oversight authority over Part H funding, including the review of state plans, this authority is not inconsistent with the invocation of § 1983. Indeed, the Supreme Court has repeatedly rejected such an argument. See Blessing, --- U.S. at ---- - ----, 117 S.Ct. at 1362-63 (noting that although agency Secretaries in Wright and Wilder had "oversight powers [that] were accompanied by limited state grievance procedures for individuals, [the Court] found that § 1983 was still available"); Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 514, 110 S.Ct. 2510, 2519-20, 110 L.Ed.2d 455 (1990) (holding that provision permitting the Secretary to cut off funds also gave the judiciary the authority to enforce rights of beneficiaries under the statute, and that the state was on notice that it must comply with the requirements of the statute); Wright v. City of Roanoke Redev. & Housing Auth., 479 U.S. 418, 428, 107 S.Ct. 766, 773, 93 L.Ed.2d 781 (1987) (Secretary's authority to audit and to cut off funds did not indicate that Congress intended to foreclose a § 1983 remedy); Rosado v. Wyman, 397 U.S. 397, 420, 90 S.Ct. 1207, 1221-22, 25 L.Ed.2d 442 (1970) (same).
 
 
 31
 We must also remember that § 1415(f) makes clear that Congress intended that a § 1983 remedy be available to the beneficiaries of the statute. The defendants suggest that § 1415(f) ought not to be read as authorizing the plaintiffs' suit under § 1983 because Part H cannot be considered to be within the ambit of § 1415(f). We cannot accept this view. As the defendants acknowledge, § 1415(f) was enacted in response to the Supreme Court's decision in Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). Smith had held that the EHA was the exclusive avenue through which to assert a claim. The EHA's extensive administrative scheme, the Court had held, foreclosed a § 1983 or similar action. Congress responded by enacting § 1415(f) which allowed "children and youth with disabilities" to bring § 1983 claims under the EHA.[19] Nevertheless, argue the defendants, at the time § 1415(f) became law, Part H did not yet exist. Moreover, they continue, when Part H was enacted, it contained no mention of § 1415(f), although it expressly incorporated other parts of the IDEA. Consequently, as the defendants also argued with respect to § 1403(a) above,[20] they assert that Part H and the rest of the IDEA are separate entities enacted at different times, with separate statements of policy, separate procedural safeguards and separate protections for different individuals. Finally, note the defendants, Part H speaks in terms of "infants and toddlers" not "children and youth."
 
 
 32
 Our review of the statute convinces us that the defendants' analysis does not accurately reflect the congressional intent. We think that the statutory language and the structure of the Act both make clear that Congress did not intend that the remedies supplied in Part H ought to foreclose other avenues of relief. As the parties agree, § 1415(f) was enacted for the express purpose of ensuring that § 1983 claims would be available to enforce the IDEA. Although § 1415(f) predated Part H, its express language encompasses the entire "chapter."[21] The relevant "chapter" to which the IDEA refers is Chapter 33 of Title 20 of the United States Code, containing the entire IDEA, of which Part H is obviously a part. Congress, in enacting Part H, therefore had no reason to provide expressly in Part H for review in an action under § 1983. Indeed, such a provision would have been redundant because the existing provision in § 1415(f) already, by its very terms, encompassed all provisions in the chapter, including Part H.
 
 
 33
 Nor do we believe that § 1415(f)'s reference to "children and youth,"[22] without specific mention of "infants and toddlers," is significant. Section 1415(f) predated Part H. Until that Part was enacted, there were no specific provisions in the statute that dealt with "infants and toddlers." The definition of "children with disabilities" under § 1401 attaches no age to the definition of such children, and therefore § 1415(f) applies to all children with disabilities. Consequently, we hold that not only did Congress not intend to foreclose resort to § 1983 in Part H, but it actually provided for its availability to enforce the IDEA.
 
 Conclusion
 
 34
 The district court properly granted the plaintiffs' motion for summary judgment; accordingly, that judgment is affirmed.
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 On June 4, 1997, the newest version of the IDEA was enacted--the Individuals with Disabilities Education Act Amendments of 1997, Pub.L. No. 105-17, 111 Stat. 37. Under the new law, the sections of the IDEA that currently are referred to as Part H now constitute Part C. See id., § 101, §§ 601(b), 631-45, 111 Stat. 37, 38, 106-23. Although certain portions of the new IDEA became effective upon enactment, Part C's effective date is July 1, 1998. See id., § 201(b), 111 Stat. 37, 156. Therefore, the majority of our analysis focuses on Part H as it is now. At relevant points in the discussion, we note material differences between the earlier IDEA and the 1997 Amended IDEA
 
 
 [2]
 The other needs Congress specifically identified that Part H was designed to address are:
 (2) to reduce the educational costs to our society, including our Nation's schools, by minimizing the need for special education and related services after infants and toddlers with disabilities reach school age,
 (3) to minimize the likelihood of institutionalization of individuals with disabilities and maximize the potential for their independent living in society,
 (4) to enhance the capacity of families to meet the special needs of their infants and toddlers with disabilities, and
 (5) to enhance the capacity of State and local agencies and service providers to identify, evaluate, and meet the needs of historically underrepresented populations, particularly minority, low-income, inner-city, and rural populations.
 20 U.S.C. §§ 1471(a)(2)-(5).
 
 
 [3]
 Specifically, Part H identifies two groups that must be served by the state's early intervention system. The statute identifies these two groups as toddlers and infants who:
 (A) are experiencing developmental delays, as measured by appropriate diagnostic instruments and procedures in one or more of the following areas: cognitive development, physical development, language and speech development ..., psychosocial development ..., or self-help skills ..., or
 (B) have a diagnosed physical or mental condition which has a high probability of resulting in developmental delay.
 20 U.S.C. §§ 1472(1)(A) & (B).
 The Act further identifies as optional beneficiaries of the program "individuals from birth to age 2, inclusive, who are at risk of having substantial developmental delays if early intervention services are not provided." 20 U.S.C. § 1472(1).
 
 
 [4]
 Early intervention services to be provided to the infants and their families include:
 (i) family training, counseling, and home visits,
 (ii) special instruction,
 (iii) speech pathology and audiology,
 (iv) occupational therapy, (v) physical therapy, (vi) psychological services, (vii) case management services ..., (viii) medical services only for diagnostic or evaluation purposes,
 (ix) early identification, screening, and assessment services,
 (x) health services ...,
 (xi) social work services,
 (xii) vision services,
 (xiii) assistive technology devices ..., and
 (xiv) transportation and related costs that are necessary to enable an infant or toddler ... to receive [these] early intervention services.
 20 U.S.C. §§ 1472(2)(E)(i)-(xiv).
 
 
 [5]
 Section 1476(b) provides:
 The statewide system required by subsection (a) of this section shall include, at a minimum--
 (1) a definition of the term "developmentally delayed" that will be used by the State in carrying out programs under this subchapter,
 (2) timetables for ensuring that appropriate early intervention services will be available to all infants and toddlers with disabilities in the State ...,
 (3) a timely, comprehensive, multidisciplinary evaluation of the functioning of each infant and toddler with a disability in the State and the needs of the families to appropriately assist in the development of the infant or toddler with a disability,
 (4) for each infant and toddler with a disability in the State, an individualized family service plan ... including service coordination services in accordance with such service plan,
 (5) a comprehensive child find system ... including a system for making referrals to service providers that includes timelines and provides for participation by primary referral sources,
 (6) a public awareness program ...,
 (7) a central directory which includes early intervention services, resources, and experts available in the State and research and demonstration projects being conducted in the State,
 (8) a comprehensive system of personnel development....
 (9) a single line of responsibility in a lead agency designated or established by the Governor ...,
 (10) a policy pertaining to the contracting or making of other arrangements with service providers to provide early intervention services ...,
 (11) a procedure for securing timely reimbursement of funds ...,
 (12) procedural safeguards with respect to the programs under this subchapter ...,
 (13) policies and procedures relating to the establishment and maintenance of standards to ensure that personnel necessary to carry out this subchapter are appropriately and adequately prepared and trained ... and
 (14) a system for compiling data on the numbers of infants and toddlers with disabilities and their families in the State in need of appropriate early intervention services....
 20 U.S.C. §§ 1476(b)(1)-(14).
 
 
 [6]
 See, e.g., 20 U.S.C. § 1477 (outlining the initial services to be provided to infants and their families to assess their needs, including the contents of the "written individualized family service plan")
 
 
 [7]
 In their principal briefs, neither party attacks directly the specific terms of the injunctive or declaratory relief. In their reply brief however, the defendants argue that the injunctive relief is overly broad. To the extent this argument, taken in context, addresses the issue of whether the statute creates enforceable rights in individuals, we address the matter below. To the extent that the defendants attempt to raise in their reply brief a new and independent argument that the injunctive relief is overly broad, we shall not consider the claim. We do not consider arguments raised for the first time in the reply brief. See United States v. Magana, 118 F.3d 1173, 1198 n. 15 (7th Cir.1997)
 
 
 [8]
 The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI
 
 
 [9]
 The Supreme Court noted that if the court found that a state had "failed to negotiate in good faith" in violation of the IGRA, "the only remedy prescribed is a[ ] [court] order directing the State and the Indian tribe to conclude a compact within 60 days." Seminole Tribe, 517 U.S. at ----, 116 S.Ct. at 1132. If that order is violated, the IGRA indicates that the court then only may require each party to "submit a proposed compact to a mediator who selects ... one." Id. If the state then refuses to accept the plan chosen by the mediator, the only sanction available is for the mediator to notify the Secretary of the Interior, whose job it becomes to establish appropriate regulations. Id. at ----, 116 S.Ct. at 1133
 
 
 [10]
 The Supreme Court noted in Seminole Tribe that one valid method of "ensuring the States' compliance with federal law" is that "an individual can bring suit against a state officer in order to ensure that the officer's conduct is in compliance with federal law." Id. at ---- n. 14, 116 S.Ct. at 1131 n. 14 (citing Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Similarly, "[a]n allegation of an on-going violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the Young fiction." Idaho v. Coeur d'Alene Tribe of Idaho, --- U.S. ----, ----, 117 S.Ct. 2028, 2040, 138 L.Ed.2d 438 (1997)
 
 
 [11]
 Although 20 U.S.C. § 1480(1) does require that a statewide system is to provide "timely administrative resolution of complaints by parents" and to allow them to "bring a civil action" in district court if they are not satisfied, most of the procedural safeguards set forth in § 1480 pertain to the specifics of the administration of the early intervention services. See, e.g., 20 U.S.C. § 1480(6) (requiring prior written notice to parents in the event a service provider plans to change certain aspects of services provided to their child). Here, the defendants have made no suggestion that the plaintiffs have failed to exhaust a viable administrative remedy
 
 
 [12]
 Part H requires the Governor to establish a single line of responsibility in a "lead agency." 20 U.S.C. § 1476(b)(9). In Illinois, the lead agency is the Illinois State Board of Education, which is directed by the State Superintendent of Education. The "lead agency" is charged with the general administration, supervision and monitoring of the programs used by Illinois to deliver the early intervention services. 20 U.S.C. § 1476(b)(9)(A)
 
 
 [13]
 This case therefore implicates no important sovereignty interests such as those at stake in Idaho. See Idaho, --- U.S. at ----, 117 S.Ct. at 2040 (noting that the Coeur d'Alene Tribe's suit was "the functional equivalent of a quiet title action which implicates special sovereignty interests")
 
 
 [14]
 Section 1403(a) was replaced under the 1997 amendments to the IDEA. See IDEA Amendments of 1997, Pub.L. No. 105-17, § 101, § 604(a), 111 Stat. 37, 47. The new section is nearly identical, but § 604(a) provides that there is no immunity for states that violate this "Act" as opposed to the "chapter." Section 604(a) was effective upon enactment of the new IDEA
 
 
 [15]
 We note that the original House Report suggests that the provision was enacted because it was inequitable to deprive beneficiaries under the statute the opportunity to bring suit in federal court while requiring the state to conform to federal standards as a prerequisite for federal funds. See H.R.Rep. No. 101-544, at 12 (1990), reprinted in 1990 U.S.C.C.A.N. 1723, 1734. Arguably, this language supports the view that Congress intended a waiver of Eleventh Amendment immunity
 
 
 [16]
 The defendants present essentially two arguments to explain why Illinois did not waive its Eleventh Amendment immunity under § 1403(a) through its participation in Part H of the IDEA. First, they note that Illinois began its participation in the Part H program in 1987, prior to the passage of § 1403(a). Second, the defendants maintain that § 1403(a) is located in the "main" IDEA, and not in Part H. In their view, Part H is an entity unto itself; therefore, a condition like that in § 1403(a) would have to appear within Part H in order to apply to Illinois. In their brief, the defendants argue that the language of § 1403(a) supports their view. That section provides that a state is not immune from actions based on violations of this "chapter." The defendants assert that "chapter" refers only to the "main" IDEA, and does not include Part H
 
 
 [17]
 We note that the Supreme Court has looked to regulations that further define and delineate the meaning of a statute to aid its analysis regarding whether the statutory and regulatory scheme creates rights enforceable under § 1983. See Wright v. City of Roanoke Redev. & Housing Auth., 479 U.S. 418, 431-32, 107 S.Ct. 766, 774-75, 93 L.Ed.2d 781 (1987) (explaining that "regulations ... have the force of law," that the regulations at issue provided specific guidelines to be followed, and that therefore "the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under ... § 1983"); see also Wilder, 496 U.S. at 511 & 513 n. 11, 110 S.Ct. at 2518 & 2519 n. 11 (noting the reliance in Wright on both a statute and regulations in the Court's previous enforceable rights determination and examining certain regulations to clarify the requirements of the statute at issue in Wilder)
 
 
 [18]
 For example, in March, 1990, Dr. Judy A. Schrag, then-Director of the Office of Special Education Programs, issued a policy memorandum indicating that "Part H is an entitlement program. This means that subject to specific provisions in the Act and regulations, each eligible child in a State and the child's family are entitled to receive the rights, procedural safeguards, and services that are authorized to be provided under a State's early intervention program." R.43-1 at Tab 1, pp. 28-29. Other similar statements were made in 1988, 1989, 1993 and 1995. See id. at pp. 29-31. In addition, the Secretary of Education established a Federal Interagency Coordinating Council to conduct policy analyses of federal programs relating to the provision of early intervention services. A member of that council has also stated that "Part H is interpreted to be an entitlement program on behalf of each eligible child and the child's family." Id. at p. 31
 
 
 [19]
 Section 1415(f) states:
 Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution ... or other Federal statutes protecting the rights of children and youth with disabilities....
 20 U.S.C. § 1415(f).
 The IDEA Amendments of 1997 replaced § 1415(f) with a nearly identical provision. See IDEA Amendments of 1997, Pub.L. No. 105-17, § 101, § 615(l ), 111 Stat. 37, 98. The part of the new IDEA containing § 615(l ) was effective as of June 4, 1997.
 
 
 [20]
 See supra note 16
 
 
 [21]
 Section 615(l), which replaced § 1415(f), refers to "this title" instead of "this chapter." See IDEA Amendments of 1997, Pub.L. No. 105-17, § 101, § 615(l), 111 Stat. 37, 98. The "title" reference is to the heading of the IDEA Amendments of 1997, which reads "TITLE I--AMENDMENTS TO THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT." See id. 111 Stat. at 37. Section 615(l) is included under Title I, which reenacts the entire IDEA, including Part H (now Part C under the 1997 Amendment). Therefore, nothing in Part H or any other part of the IDEA is intended to foreclose resort to § 1983 for enforcement of rights created by the IDEA
 
 
 [22]
 We note that the 1997 IDEA Amendments removed the "and youth" language. Section 615(l), now in effect, refers only to "children with disabilities." See IDEA Amendments of 1997, Pub.L. No. 105-17, § 101, § 615(l), 111 Stat. 37, 98