**WISCONSIN BELL, INC. d/b/a Ameritech Wisconsin, Plaintiff,**

v.

**PUBLIC SERVICE COMMISSION OF WISCONSIN, and Cheryl L. Parrino, Daniel J. Eastman, and Joseph P. Mettner, Defendants.**

**Wisconsin Bell, Inc. d/b/a Ameritech Wisconsin, Plaintiff,**

v.

**Public Service Commission of Wisconsin, and Cheryl L. Parrino, Daniel J. Eastman, and Joseph P. Mettner, in their official capacities as members of the Commission,**

and

**MCI Telecommunications Corp. and MCI Metro Access Transmission Services, Inc., Defendants,**

and

**United States of America, Intervenor.**

**MCI Telecommunications Corp., and MCI Metro Access Transmission Services, Inc., Plaintiffs,**

v.

**Wisconsin Bell, Inc. d/b/a Ameritech Wisconsin, Public Service Commission of Wisconsin, and Cheryl L. Parrino, Daniel J. Eastman, and Joseph P. Mettner, in their official capacities as members of the Commission, Defendants,**

and

**United States of America, Intervenor.**

**Wisconsin Bell, Inc. d/b/a Ameritech Wisconsin, Plaintiff,**

v.

**TCG Milwaukee, Inc., Public Service Commission of Wisconsin, Cheryl L. Parrino and Joseph P. Mettner, Commissioners of the Public Service Commission of Wisconsin, Defendants,**

and

**Time Warner Communications of Milwaukee, L.P., Intervenor.**

Nos. 97–C–566–C, 98–C–11–C, 98–C–153–C and 98–C–366–C.

United States District Court,
W.D. Wisconsin.

Nov. 25, 1998.

Wayne O. Hanewicz, Foley & Lardner, Madison, WI, Bradley D. Jackson, Foley & Lardner, Madison WI, John R. Dawson, Foley & Lardner, Milwaukee WI, for Wisconsin Bell, Inc., Ameritech Wisconsin.

Glenn Kelley, Public Service Commission of WI, Chief Counsel, Madison WI, for Public Service Commission of WI.

Linda M. Clifford, Lafollette & Sinykin, Madison WI, for U.S. Xchange, L.L.C. (Amicus).

Niles Berman, Wheeler, Van Sickle & Anderson, S.C., Madison WI, for MCI Telecomm. Corp., MCIMetro Access Trans.

Anthony A. Tomaselli, Quarles & Brady, Madison WI, for AT & T Communications of Wisconsin.

Michael J. Varda, Staff Attorney, Public Service Commission, Madison WI, for Public Service Commission of WI, Parrino, Cheryl L., Eastman, Daniel J., Mettner, Joseph P.

Andrea M. Sharrin, U.S. Dept. of Justice, Federal Programs Branch, Washington DC, for Federal Communications (Prop in).

Bradley D. Jackson, Foley & Lardner, Madison WI, for Wisconsin Bell, Inc., Ameritech Wisconsin, plaintiff(s).

Kathleen M. Mulligan, Sidley and Austin, Chicago, IL, for TCG Milwaukee, Inc.

Mary M. Stevens, Public Service Commission, Madison, WI, for Public Service Commission of Wis., Parrino, Cheryl L., Mettner, Joseph P.

Peter Gardon, Reinhart, Boerner, Vandeuren Norris & Rieselbach, SC, Madison, WI, for Time Warner Communications.

Michael L. Shor, Swidler & Berlin, Washington DC, for U.S. Xchange, L.L.C.

## OPINION AND ORDER

CRABB, District Judge.

These four civil actions are brought pursuant to the Telecommunications Act of 1996. At the heart of each lies a ruling of defendant Public Service Commission of Wisconsin issued under the auspices of the Act. In essence, the actions are appeals of the commission's rulings. Defendants in all the cases are the commission and its members, who are named in their official capacities only. The actions are before the court on motions filed by defendants in each case to dismiss on Eleventh Amendment immunity grounds. To expedite resolution of the motions, I will address the Eleventh Amendment issue in a single opinion.

The following Eleventh Amendment analysis is complex, in part because the Telecommunications Act calls for a unique sharing of federal and state regulatory power, and in part because one recent Supreme Court decision involving the Eleventh Amendment, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), has raised many questions about the current status of Eleventh Amendment immunity and has spurred a "lively debate in judicial and academic circles." *See Gorka v. Sullivan*, 82 F.3d 772, 774 (7th Cir.1996). In the end, although I agree with defendants that they are entitled to immunity, a ruling on their motion to dismiss must be stayed temporarily. The parties have not addressed adequately whether defendants' entitlement

to immunity requires that these actions be dismissed in their entirety or go forward without defendants.

The few facts material to defendants' Eleventh Amendment claim are undisputed. Underlying each of the cases are rulings that the commission issued on matters relating to the provision of local telephone service in Wisconsin. Cases 98–C–11–C, 98–153–C and 98–C–366–C involve the commission's rulings on certain "interconnection agreements." Case number 97–C–566–C involves a ruling on a "statement of generally available terms and conditions." (These terms will be defined later.) In all four cases, the commission's determinations are alleged to be inconsistent with the Telecommunications Act of 1996.

On the Eleventh Amendment issue, the parties may be placed in two camps. One consists of defendant commission and its members, defendants Cheryl L. Parrino, Daniel J. Eastman [†] and Joseph P. Mettner. With one voice, they contend that they are entitled to Eleventh Amendment immunity.

The other camp's constituents are more diverse. They include Wisconsin Bell, Inc., MCI Telecommunications Corporation, MCI Metro Access Transmission Services, Inc., and TCG Milwaukee, Inc. These firms provide telephone services in Wisconsin and are parties to various interconnection agreements that were the subject of proceedings before defendant commission. In addition, Wisconsin Bell submitted a statement of generally available terms and conditions that was modified by the commission. Also in this camp are two intervenors. In 98–C–11–C, the United States has weighed in solely on the Eleventh Amendment issue; in 98–C–366–C, Time Warner Communications of Milwaukee, L.P., another telecommunication firm, has weighed in on immunity and the merits. Although the telecommunications firms in this camp have different views on the merits, they and the federal government all contend that the Eleventh Amendment is not a bar to proceeding against either defendant commission or its members. Moreover, although they advance different reasons for rejecting defendants' motion to dismiss, they

all oppose the motion. For this reason, I will present their arguments collectively and refer to them as "plaintiffs" to simplify the discussion.

Further description of the parties and the facts of the underlying rulings is immaterial to the motion to dismiss, but background information about the Telecommunications Act of 1996 is essential. Plaintiffs and defendants devote substantial portion of their briefs to describing relevant provisions of the Act. This information may be fairly summarized as follows.

## BACKGROUND

A central goal of the Telecommunications Act of 1996, Pub.L. 104–104, 110 Stat. 56, (codified in scattered sections of Title 47 of the United States Code), is to "erode the monopolistic nature of the local telephone service industry." *See Iowa Utilities Board v. FCC*, 120 F.3d 753, 791 (8th Cir.1997), *cert. granted*, —— U.S. ——, 118 S.Ct. 879, 139 L.Ed.2d 867 (1998). The breakup of AT & T brought many new entrants to the long distance market; for the most part, however, local markets remained under the dominance of single firms. In 1996, an estimated 92% of the local service market was controlled by ten firms that did not compete in any market. Moreover, the local telephone market is roughly three times the size of the long distance market: $95 billion versus $31 billion in annual revenue. Hence, Congress recognized that transition from the regulated monopoly paradigm to a competition-oriented paradigm could have tremendous consumer benefit. *See* Duane McLaughlin, Note, *FCC Jurisdiction Over Local Telephone Under the 1996 Act: Fenced Off?*, 97 Colum.Law.Rev. 2210 (1997).

To move toward a competitive model, Congress forced existing local providers to share their equipment and services with new entrants. The linking of a new entrant to an existing or "incumbent" carrier's equipment is known as "interconnection." *See Iowa Utilities*, 120 F.3d at 791. In legal terms, Congress required interconnection by imposing specific duties on incumbent carriers.

[†] Daniel J. Eastman is not a defendant in 98–C–366–C.

For example, incumbents are obliged to negotiate in good faith with new market entrants requesting interconnection, *see* § 251(c)(1), and must allow new entrants to resell the services that they may buy from the incumbent. See § 251(c)(4).

Incumbents and new entrants may enter interconnection agreements voluntarily. *See* § 252(a)(1). If necessary, a party to an interconnection negotiation may petition the state's utility commission to mediate. *See* § 252(a)(2). Finally, if negotiations are unsuccessful after 135 days, a party may petition the state commission to arbitrate unresolved matters. *See* § 252(b)(1).

All interconnection agreements are subject to review by the state commission whether they are arrived at voluntarily or through mediation or arbitration:

Any interconnection agreement adopted by negotiation or arbitration shall be

submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

§ 252(e)(1). The grounds upon which a state commission may reject an agreement include the potential for discrimination against third party carriers and inconsistency with the public interest. *See* § 252(e)(2)(A).

The Act provides a remedy in the event that a state commission fails to act on a matter related to an interconnection agreement:

If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the [Federal Communication] Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.

§ 252(e)(5). FCC intervention is not automatic, however. Under the Act, interconnection agreements are deemed approved if the state commission does not act on a voluntary or mediated agreement within 90 days or on a arbitrated agreement within 30 days. *See* § 252(e)(4). Under FCC regulations, if an agreement is "approved" because the state commission did not take action, a state commission has not "failed to act" and the FCC does not intervene. *See* 47 C.F.R. § 51.801(c). As a result, under the regulations, the FCC acts in place of a state commission only if the state commission fails to respond to a request for mediation or arbitration. *See id.* § 51.801(b).

Another aspect of the Telecommunications Act is that firms limited traditionally to providing local service are permitted to enter long distance markets. Contingent upon the opening of its local markets to new entrants, which is marked by the existence of approved interconnection agreements, *see* § 271(c)(1)(A), a local carrier that was part of the old Bell system is entitled to enter the long distance market within its state. *See* § 271(b). Alternatively, if there has been no request for interconnection, old Bell system members may enter this part of the long distance market if they receive the state commission's approval of a "statement of the terms and conditions that the company generally offers to provide such access." *See* § 271(c)(1)(B); *see also* § 252(f). The statement sets out the contractual terms that will apply to any future interconnection agreement.

Historically, state and federal government shared the duty to regulate the monopolies that provided local and long distance telephone service. The Telecommunications Act of 1934 set out a dual regulatory, model under which the states' public utility commissions had authority over the *intra* state market and the FCC had authority over the *inter* state market. *See* Jim Chen, *The Legal Process and Political Economy of Telecommunications Reform,* 97 Colum.L.Rev. 835, 837–84 (1997).

State commissions continue to have a significant role in the regulation of local telephone service under the 1996 Telecommunications Act: one, they are responsible for mediating and arbitrating disputes between parties over the formation of interconnection agreements, *see generally* §§ 252(a), (b);

two, they are required to review any resulting interconnection agreement, *see* § 252(e)(1); three, they must review statements of generally available terms, *see* § 252(f)(2); and four, they retain the primary authority to enforce the substantive terms of interconnection agreements, *see Iowa Utilities Board*, 120 F.3d at 804. Nonetheless, the state commissions' authority over local telephone service is not exclusive. The FCC has conditional authority to act for a state commission that fails to act. Also, the federal district courts have jurisdiction to review determinations of the state commissions under § 252(e)(6), which provides:

(6) Review of State commission actions

In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

Under the Act, federal judicial review is the sole remedy to correct errors in determinations related to interconnection agreements. State judicial review is barred: "No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." § 252(e)(4).

## OPINION

## I. ELEVENTH AMENDMENT IMMUNITY

### A. *Introduction*

■ Generally, the Eleventh Amendment divests federal courts of jurisdiction over suits brought by private parties against a state. *See Marie O. v. Edgar*, 131 F.3d 610, 614 (7th Cir.1997). There are three well-recognized exceptions to this limitation on federal jurisdiction: 1) Congress may abrogate the states' Eleventh Amendment immunity; 2) a state may waive its Eleventh Amendment immunity and consent to suit in federal court; and 3) pursuant to *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), individuals may sue state officials to obtain prospective injunctive relief to remedy ongoing violations of federal law. *See Marie O.*, 131 F.3d at 615.

Plaintiffs contend that jurisdiction exists pursuant to both the general federal question statute, 28 U.S.C. § 1331, and 47 U.S.C. § 252(e)(6), which provides that any party "aggrieved" by the determination of a state commission "may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." There is no real dispute that defendant commission is an arm of the state of Wisconsin. Thus, the general rule of Eleventh Amendment immunity applies. However, plaintiffs contend that the state of Wisconsin waived its Eleventh Amendment immunity by choosing to participate in the arbitration and review of interconnection agreements and by choosing to review a statement of generally available terms and conditions. Alternatively, they contend that under *Ex Parte Young*, the actions may go forward against defendant commission members to prevent them from enforcing their rulings to the extent that they are inconsistent with the Act.

### B. *Abrogation*

■ A brief discussion of abrogation in the context of the Act serves as a useful starting point to the analysis of plaintiffs' contentions. "Congress may constitutionally abrogate the States' Eleventh Amendment immunity under a particular statute if it both unequivocally expresses its intent to do so and acts pursuant to a valid exercise of power." *Varner v. Illinois State University*, 150 F.3d 706, 708 (7th Cir.1998). It is uncontested that Congress enacted the Telecommunications Act pursuant to its authority to regulate interstate commerce. *See* § 151 (regulation of "interstate and foreign commerce in communication" ensures fast and efficient telecommunication services available nationwide). When President Clinton signed the

Act on February 8, 1996, it appeared that the commerce clause provided Congress with authority to abrogate the states' Eleventh Amendment immunity. Seven years earlier, a majority of Supreme Court Justices had ruled in separate opinions that the commerce clause did supply such authority to Congress. See *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 23, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (plurality opinion); *id.* at 57, 109 S.Ct. 2273 (White, J. concurring).

Hardly had the President's signature dried when the Supreme Court overruled *Union Gas*, which meant that the commerce clause no longer provided Congress the authority to abrogate the states' immunity. See *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The Seminole Tribe had sued the state of Florida and its governor in federal court, seeking to require the state to participate in negotiations to allow gaming as prescribed under the Indian Gaming Regulatory Act. Florida had contended that it was immune from a claim brought under the act. See *id.* at 51–52, 116 S.Ct. 1114. A five justice majority concluded that Florida was entitled to immunity. Congress had legislated the Indian Gaming Regulatory Act under authority of the Indian commerce clause, which the Supreme Court held to be an insufficient basis for abrogation. The Court overruled *Union Gas* to the extent it had held that the closely related interstate commerce clause gave Congress abrogation power. See *id.* at 66, 72–73, 116 S.Ct. 1114. In light of Seminole, Congress's probable intention simply to abrogate the states' Eleventh Amendment immunity through enactment of the Telecommunications Act is of no effect.

### C. *Waiver*

In contending that Wisconsin waived its Eleventh Amendment immunity, plaintiffs do not argue that Wisconsin did so expressly through state legislation. *Compare Port Authority Trans–Hudson Corporation v. Feeney*, 495 U.S. 299, 306–309, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (New York and New Jersey statutes reveal the states' intent to be subject to suit in federal court for claims arising out of interstate transportation compact). Instead, they rely on the doctrine of "constructive" or "implied" waiver, under which Congress may condition a state's participation in a federally regulated activity upon the state's waiver of immunity from lawsuits arising out of the activity. See *Close v. State of New York*, 125 F.3d 31, 39 (2d Cir.1997) (summarizing the doctrine); *see also* Erwin Chemerinsky, *Federal Jurisdiction*, § 7.6 at 410 (2d ed.1994) (citing *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) and John R. Pagan, *Eleventh Amendment Analysis*, 39 Ark.L.Rev. 447 (1986)). In a nutshell, plaintiffs contend that the public service commission chose voluntarily to become involved in the interconnection process and in so doing, consented to suit in federal court as prescribed by the Telecommunications Act.

The implied waiver doctrine has two criteria. The first is that federal law must provide notice to a state that its participation in an activity may subject the state to suit in federal court. See *Close*, 125 F.3d at 39 (Congress must evince "clear and unequivocal intent" to hold the states liable in federal court); *see also* Kit Kinports, *Implied Waiver after Seminole Tribe*, 82 Minn.L.Rev. 793, 800 (1998) (*Welch v. Texas Highways & Public Transportation Dept.*, 483 U.S. 468, 476–78, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987), adopted "clear statement" rule for implied waivers). Just as Congress must express in clear language its intent to *abrogate* the states' immunity, *see Varner*, 150 F.3d at 708, Congress must use clear language when it conditions a state's participation in a federal program upon a waiver of the state's immunity.

I agree with plaintiffs that the Telecommunications Act satisfies this criterion. The provision establishing federal court jurisdiction to review state commission rulings, entitled "Review of State commission actions," provides in full:

In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission

makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

47 U.S.C. § 252(e)(6). This provision provides clear notice to the states that their commissions will have to defend their rulings in federal court. Someone reading the language would know *who* will be involved in any proceedings and *where* those proceedings will occur. The first sentence of § 252(e)(6) makes it clear that state commissions might be sued: it says that there will be "judicial review of the *Commission's* actions." (Emphasis added). The second sentence reveals where they might be sued: it says that review will occur in the "appropriate *Federal* district court." (Emphasis added).

Defendants are wrong to label § 252(e)(6) as a mere "general authorization for suit in federal court," which is insufficient to confer immunity. *See Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 246, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). In *Atascadero*, the issue was whether Congress abrogated the states' immunity in enacting the Rehabilitation Act. *See id.* at 242, 105 S.Ct. 3142. The act included a provision creating a federal cause of action enforceable against "any recipient" of federal funds. Because the act did not specify that the class of recipients subject to suit included the states, the Court held that the general authorization was insufficient to waive the states' immunity: "[G]iven their constitutional role, the States are not like any other class of recipients of federal aid." *See id.* at 246, 105 S.Ct. 3142. Section 252(e)(6) is far from the provision held insufficient in *Atascadero*. It specifies in clear terms that states will be subject to suit and that they will be subject to suit in federal court.

The constructive waiver doctrine's second criterion is that the state's participation in the federally regulated activity must be voluntary. *See Close*, 125 F.3d at 39. A state must have a realistic choice to avoid participating in the activity. *See id.* (citing Chemerinsky, § 7.6 at 410). Two Supreme Court decisions inform this inquiry: *Parden v. Terminal Ry. of Alabama State Docks Dept.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), and *Employees of the Dept. of Public Health & Welfare v. Department of Public Health & Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973) (*Missouri Employees*).

*Parden* involved personal injury claims arising under the Federal Employees Liability Act, which governs railways operating in interstate commerce. Several employees of Alabama's state-owned railway system brought suit in federal court seeking compensation from the state for work-related injuries. Alabama argued that the act did not apply to its state-run railway and alternatively, that it was entitled to immunity pursuant to the Eleventh Amendment. The Court rejected both contentions. In its discussion of immunity, the Court noted initially that Alabama began operating its railway *after* Congress enacted the Federal Employees Liability Act. Thus, the Court concluded, Alabama "necessarily consented" to being sued in federal court when it chose to enter the railway business. The Court reasoned that the commerce clause authorized Congress to regulate railway systems; "by enacting the FELA in the exercise of this power, Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act." *See Parden*, 377 U.S. at 192, 84 S.Ct. 1207.

In *Missouri Employees*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251, employees of the state's mental health agencies brought a damage suit in federal court, contending that the state's overtime compensation rules violated the Fair Labor Standards Act. Although the original act did not apply to state employees, a 1966 amendment extended coverage to employees at state hospitals and educational institutions. The Missouri employees argued that like Alabama, Missouri had waived its Eleventh Amendment immunity; like Alabama, which chose to start a railway after railways became the subject of a federal law, Missouri chose to remain active in the field of mental health after the field became the subject of a federal law.

The Court declined to extend its ruling in *Parden*, finding it significant that Alabama's ran its railway " 'for profit.' " *See Missouri Employees*, 411 U.S. at 284, 93 S.Ct. 1614 (quoting *Parden*, 377 U.S. at 185, 84 S.Ct. 1207). Moreover, in a concurring opinion, Justice Marshall added that in contrast to Alabama, which had entered the railway business long after the enactment of federal law in that field, Missouri

> was fully engaged in the operation of the affected hospitals and schools at the time of the 1966 amendments. To suggest that the State has the choice of either ceasing operation of these vital public services or "consenting" to federal suit, suffices, I believe, to demonstrate that the State did not voluntarily consent to the exercise of federal jurisdiction in this case.

*Missouri Employees*, 411 U.S. at 296, 93 S.Ct. 1614 (Marshall, J., concurring, joined by Stewart, J.).

Lower courts and commentators have interpreted *Missouri Employees* to stand for the proposition that a state's continued involvement in "traditional government operations" cannot amount to a waiver of its Eleventh Amendment right not to be sued in federal court. *See Abril v. Commonwealth of Virginia*, 145 F.3d 182, 190 (4th Cir.1998) (citing *Missouri Employees*, 411 U.S. at 284–85, 93 S.Ct. 1614); *Digiore v. State of Illinois*, 962 F.Supp. 1064, 1074–75 (N.D.Ill. 1997) (Illinois's acceptance of federal traffic accident reduction funds not evidence that state consented to suit; Alabama's operation of railway in *Parden* "fundamentally distinct" from Illinois's policing of state highways); *Goebel v. State of Colorado*, No. 93–K–1227, 1996 U.S.Dist. Lexis 20929 at *29–30 (D.Colo. Jun. 25, 1996) (state of Colorado entitled to Eleventh Amendment Immunity from state employees' claim for overtime pay in accordance with Fair Labor Standards Act; no real choice existed for Colorado if it had either to waive Eleventh Amendment immunity or disband much of its executive branch); Pagan, *Eleventh Amendment Analysis*, 39 Ark.L.Rev. at 495 (a state cannot choose to waive immunity unless it has realistic alternative; no state can abandon its responsibilities in education, public health and

law enforcement) (citing *Missouri Employees*, 411 U.S. at 296, 93 S.Ct. 1614 (Marshall, J., concurring)); *but see Carey v. White*, 407 F.Supp. 121, 123–125 (D.Del.1976) (state of Delaware waived immunity from claims arising under Fair Labor Standards Act; state continued to operate mental hospital after federal law was extended to cover employees at state hospitals).

Plaintiffs contend that in the Telecommunications Act, Congress permitted a state commission to become involved in the arbitration, mediation and review of matters related to interconnection *provided* the states waived immunity to a federal lawsuit challenging the ruling of its commission. To plaintiffs, it is critical that state commissions may "opt out" of this regulatory role. They explain that under § 252(e)(4), if a state commission fails to act, the FCC assumes jurisdiction. *See* Br. of United States in Opp'n to Motion to Dismiss, No 98–C–11–C, dkt. # 43, at 5. Thus, plaintiffs conclude, "The Wisconsin Commissioners cannot plausibly argue that they are entitled to exercise authority available to them solely through a delegation from Congress without accepting as well the condition attendant to its exercise—that is, federal district court review of the conformity of their determinations applying federal law." *Id.* at 15. Moreover, plaintiffs cite many district court opinions that have applied the constructive waiver doctrine with respect to the review of state commission rulings under the Act. *See U.S. West Communications, Inc. v. TCG Seattle*, 971 F.Supp. 1365, 1369 (W.D.Wash.1997) (states are permitted, not required, to act as principal regulatory body; federal law is clear that states accepting congressional invitation are subject to judicial review in federal court); *see also Michigan Bell Telephone Co. v. MFS Intelenet of Michigan, Inc.*, 16 F.Supp.2d 817, 825–26 (W.D.Mich.1998) (citing *US West Communications*, 971 F.Supp. at 1370, and eighteen other published and unpublished district court opinions).

■ With respect, I disagree with the reasoning of these courts that the doctrine of constructive waiver applies to the Telecommunications Act. I reach this conclusion after considering several factors.

■ *a.* Plaintiffs mischaracterize the nature of telecommunications regulation. It is not true that Congress devised a brand new role for the states when it enacted the Telecommunications Act of 1996. It acted against a backdrop of fifty years of regulatory history during which state commissions served as the primary regulators of local telephone service. Viewed correctly, the Telecommunications Act of 1996 *preserved* state regulatory power in this area. *See* Phillip Rosario and Mark F. Kohler, *The Telecommunications Act of 1996: A State Perspective,* 29 Conn.L.Rev. 331, 337–338 (1996); *see also Iowa Utilities Board v. FCC,* 120 F.3d 753, 800 (8th Cir.1997), *cert. granted,* —— U.S. ——, 118 S.Ct. 879, 139 L.Ed.2d 867 (1998) (congressional grant of authority in 1996 Telecommunications Act allowing state commissions to set local pricing is consistent with states' historical role in regulation of local telephone service). The constructive waiver doctrine is not applicable when the federal government amends or enacts a law making a state subject to suit merely by continuing in existing activities that protect its citizens. *See Missouri Employees,* 411 U.S. at 296, 93 S.Ct. 1614 (Marshall, J., concurring).

*b.* Plaintiff's contention that a state may opt out of duties under the Telecommunications Act is not entirely correct. True, if a state commission refuses to arbitrate or mediate a dispute, the FCC must step into the commission's shoes, *see* § 252(e)(5), but that is only half of the regulatory picture. If because a state desires to opt out of the Act, it fails to review a agreement that the parties arrived at voluntarily, the agreement is deemed approved automatically and the FCC does not act in place of the state commission. *See* § 252(e)(4); 47 C.F.R. § 51.801(c). Thus, a state commission must review a voluntary agreement or accept the consequence that the agreement will go into effect without any form of government oversight.

*c.* In the Telecommunications Act of 1996, Congress recognized that interconnection may affect local interests: an agreement may be rejected on grounds that it is "not consistent with the public interest, convenience and necessity." *See* § 252(e)(2)(A)(ii). It is true that the affirmative efforts of mediating and arbitrating interconnection agreements and reviewing statements of generally available terms and conditions are new tasks for state commissions. But overall, state commissions' charters to protect the public from telecommunications firms have not changed. Congressional authorization to reject interconnection agreements because they are inconsistent with the public interest proves that the transition from regulated monopoly to competition has not eliminated the risk that local service providers may act contrary to the public interest. Thus, staying out of the interconnection process cannot be said to be a realistic option for a state commission. Unlike Alabama's decision to start a railway, a state does not enter into the "business" of regulating interconnection agreements. *Compare Parden,* 377 U.S. at 192, 84 S.Ct. 1207.

For these reasons, I reject plaintiffs' contention that defendant commission waived its Eleventh Amendment immunity in these cases, although one other matter relating to constructive waiver warrants brief attention. Last month, the Fifth Circuit held that in the wake of *Seminole,* "Congress cannot condition states' activities that are regulable by federal law upon their 'implied consent' to being sued in federal court." Consequently, the court of appeals rejected a claim that, by operating a press at a state university, the state of Texas waived its Eleventh Amendment immunity to claims arising under the Copyright Act. *See Chavez v. Arte Publico Press,* 157 F.3d 282, 285–287 (5th Cir.1998). Indeed, the issue whether *Seminole* quashed the doctrine of implied waiver is one part of the judicial and academic debate over the decision. *See Digiore,* 962 F.Supp. at 1075 (because *Seminole* rejected congressional attempts to expand federal jurisdiction using the commerce clause, continuing viability of *Parden* is "extremely questionable"); *but see Chavez,* 157 F.3d at 291 (Wisdom, J., dissenting) ("[T]here is a place, although limited, for the *Parden* waiver doctrine after *Seminole*"); *MCI Telecommunications v. Illinois Bell Telephone Co.,* No. 97 C 2225, 1998 WL 156678, at *5–7 (N.D.Ill. Mar.31, 1998) (*Seminole* did not invalidate doctrine of implied waiver); Kinports, *Implied Waiver after*

*Seminole Tribe,* 82 Minn.L.Rev. at 795 (doctrine of implied waiver "retains validity after *Seminole Tribe*"). However, because I conclude that the doctrine is inapplicable on the merits, there is no need to contribute to the debate.

### D. *Ex parte Young*

Alternatively, plaintiffs contend *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), gives them a solid basis on which to proceed against the members of defendant commission despite a conclusion that the commission itself is entitled to immunity. Plaintiffs argue that the Eleventh Amendment does not prevent this court from exercising jurisdiction over defendant commission members in their official capacities and granting prospective injunctive relief against these defendants to prevent them from committing further violations of the Telecommunications Act. In support, plaintiffs cite the great number of district courts that have found *Ex parte Young* applicable in these circumstances. *See Michigan Bell Telephone Co. v. MFS Intelenet of Michigan, Inc.,* 16 F.Supp.2d 817, 826–27 (W.D.Mich. 1998) (holding that *Ex Parte Young* applies and citing nineteen other published and unpublished federal court decisions to same effect).

Defendants deny that *Ex parte Young* is applicable on various grounds, some of which may be described as technical. These include defendants' arguments that 1) the doctrine cannot apply because the acts related to interconnection are discretionary and the doctrine applies only in circumstances in which state officials perform ministerial acts; and 2) there is no ongoing violation of federal law because defendant commissioners have already made their rulings. Defendants' strongest contention is also their most ambitious. They attack the reasoning of the district courts that have found the doctrine applicable, arguing that these courts have not properly taken into account the other significant holding of *Seminole:* "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state offi-

cer based upon *Ex parte Young.*" *Seminole,* 517 U.S. at 74, 116 S.Ct. 1114. Briefly, defendants contend that under *Seminole,* since Congress prescribed a remedy for state commissions' violations of the Telecommunications Act (a right to judicial review in federal court), the federal courts lack jurisdiction to proceed under *Ex parte Young.*

In *Seminole,* after rejecting the tribe's contention that Congress abrogated the states' immunity in enacting the Indian Gaming Regulatory Act, the Court turned to the tribe's alternative contention that *Ex parte Young* served as a means by which to obtain relief. The tribe contended that federal court jurisdiction existed to proceed in an action against the governor to obtain injunctive relief compelling him to participate in negotiations for a gaming compact as set forth in the act. The Court held the doctrine inapplicable. It reasoned that in contrast to the "modest set of sanctions" Congress established in the Indian Gaming Regulatory act, a suit under *Ex parte Young* would expose the defendant state official to the "full remedial powers of a federal court." Also, allowing a suit for relief under *Ex parte Young* would render ineffective the remedies Congress designed. The Court acknowledged that Congress has authority to establish federal court jurisdiction over state officials comparable to *Ex parte Young* jurisdiction, but concluded that Congress had not applied such authority when it wrote the Indian Regulatory Gaming Act (In a footnote, number 17, the Court contrasted the Indian Gaming Regulatory Act, which uses the term "the State" repeatedly, to 42 U.S.C. § 11001, which requires "the Governor" of a state to establish an emergency response commission.) Of significance, the Court ruled that even though Congress's remedial scheme under the Indian Gaming Act did not work because it violated the states' Eleventh Amendment rights, the Court could not "rewrite the statutory scheme in order to approximate what we think Congress might have wanted." *See Seminole,* 517 U.S. at 74–76, 75 n. 17, 116 S.Ct. 1114.

The implications of *Seminole* are two-fold. One, Congress is capable of fashioning reme-

dies for violations of the statutory rights it creates. In fact, footnote seventeen reveals that in fulfilling this legislative function, Congress may rely on *Ex parte Young* and grant the federal courts jurisdiction to proceed in matters against certain state officials. Two, Congress is a superior legislator to the courts and its choice of remedy must be respected. This point was acknowledged in *Crawford v. Indiana Dept., of Corrections,* 115 F.3d 481 (7th Cir.1997), in which the court of appeals cited *Seminole*'s discussion concerning *Ex parte Young* as standing for the principle that "courts do not create exceptions to statutes every time it seems that the legislature overlooked something. The legislative role of the courts is more confined than that of the legislature." *See id.* at 484. Moreover, Professor David Currie explains that despite objections to *Seminole,* *e.g.,* Vicki C. Jackson, *Seminole Tribe, The Eleventh Amendment, and the Potential Evisceration of Ex Parte Young,* 72 N.Y.U.L.Rev. 495 (1997), there is "nothing startling" about a conclusion that a statute providing a remedy for a violation of federal law impliedly precludes other forms of relief. *See* David P. Currie, *Ex Parte Young after Seminole Tribe,* 72 N.Y.U.L.Rev. 547, 548 (1997).

Therefore, applying *Seminole* entails an inquiry into two matters. First, the court must ascertain whether Congress created a remedy for the federal statutory rights it created. Second, it must determine whether the congressional remedy contemplates a suit against a state official. (It is possible that Congress will implicitly authorize a suit under *Ex parte Young* by imposing specific duties on a state official. *See Seminole,* 517 U.S. at 75 n. 17, 116 S.Ct. 1114.) *Marie O. v. Edgar,* 131 F.3d 610 (7th Cir.1997), is an example of such an inquisition. Four infants with disabilities brought suit against the state of Illinois's governor and superintendent of education seeking relief under the Individuals with Disabilities Education Act. The plaintiffs alleged that these state officials had failed to provide them with services guaranteed under the federal statute. The district court determined that jurisdiction over the state officials existed pursuant to *Ex parte Young,* and, after finding the officials in violation of the act, entered an injunction

requiring compliance with the act. On appeal, armed with *Seminole,* the state officials argued that because the act contained a remedial scheme, the district court erred in applying *Ex parte Young.*

The court of appeals found that *Seminole* did not bar the district court's exercise of jurisdiction under the doctrine, for two reasons. One, the Individuals with Disabilities Education Act imposed duties on individual state officers, unlike the Indian Gaming Regulatory Act, which imposed duties on "the State." *See Marie O.,* 131 F.3d at 616–17. Thus, it was consistent with the remedial scheme contemplated by Congress to compel the defendant *state officials* to fulfill their duties under the act, analogously to *Ex parte Young.* Two, the Individuals with Disabilities Education Act gave district courts discretion to " 'grant such relief as it determines is appropriate,' " unlike the remedial scheme of the Indian Gaming Regulatory Act, which prescribed a more limited federal judicial remedy. *See Marie O.,* 131 F.3d at 616 (quoting 20 U.S.C. § 1480). Thus, exposing the defendant state officials to the full remedial powers of a federal court was in line with congressional intent. *See Seminole,* 517 U.S. at 75, 116 S.Ct. 1114.

Returning to the Telecommunications Act, the district courts that have found *Ex parte Young* applicable in the context of the Telecommunications Act have distinguished *Seminole* by focusing on the Court's use of the word "detailed." *See id.* at 74, 116 S.Ct. 1114 ("where Congress has prescribed a *detailed* remedial scheme") (emphasis added). An example is *MCI Telecommunications v. Illinois Bell Telephone Co.,* No. 97 C 2225, 1998 WL 156678 (N.D.Ill. Mar.31, 1998), in which the court concluded,

> In contrast to the IGRA, the Telecommunications Act does not incorporate a "detailed remedial scheme" that would limit the type of remedies that a district court could prescribe in such a case. In fact, the only direction that the Act gives the court is that the court shall "determine whether the agreement or statement meets the requirements of section 251."

*Id.,* 1998 WL 156678 at *11. This view of the Telecommunications Act is not unanimous, however. In *MCI Telecommunications Corp. v. Frisby,* 998 F.Supp. 625 (D.Md. 1998), the district court held that Congress provided an adequate remedy to vindicate a state commission's violation of §§ 251 and 252: a right to have the ruling reviewed in federal court. *See id.* at 630.

It is true that the congressionally created remedy in the Telecommunications Act is much less "detailed" than the remedy in the Indian Gaming Regulatory Act. But it is improper simply to compare the remedies of the Indian Gaming Regulatory Act and the remedies of the federal scheme at issue to see which is more detailed. Such an analysis reads *Seminole* too literally. *Seminole* holds that Congress's choice of a remedy must be respected and a "simple" remedy may be all that is necessary to secure federal rights.

■ Pursuant to *Seminole,* I agree with defendants that the doctrine of *Ex parte Young* is inapplicable. Under the Telecommunications Act, state commissions oversee and supervise interconnection agreements in several ways. They may help set the terms of the agreement by either participating in meditations or arbitrations, *see* §§ 252(a), (b), or in reviewing statements of generally available terms and conditions that will govern future agreements. *See* § 252(f). Also, state commissions act in an adjudicatory capacity, reviewing final agreements to ensure that they are in compliance with the requirements of the Act. *See* § 252(e)(1). Finally, state commissions serve a police function, enforcing noncompliance with interconnections agreements. *See Iowa Utilities Board,* 120 F.3d at 804. According to plaintiffs, to ensure that state commissions conduct these activities in compliance with the federal telecommunications law, a federal court must be able to assert jurisdiction over the individual state commissioners and order prospective injunctive relief requiring compliance with federal law. I disagree. Although state commissions' activities are diverse, they all hinge on a written ruling. (Indeed, in all these four cases, defendant commission's written rulings are being challenged.) Congress made a logical choice when it decided

to limit the remedy within the Telecommunications Act to having a commission's ruling tested in federal court. Such limited review is adequate to cure errors in federal law without subjecting state commissioners to the full remedial powers of a federal district court. Limited review keeps the number of litigants to a minimum, which conserves judicial resources. Under *Seminole,* 517 U.S. at 74, 116 S.Ct. 1114, because the remedy Congress chose secures federal rights adequately, this court lacks jurisdiction to proceed independently pursuant to *Ex parte Young.*

Unfortunately for plaintiffs, the remedy Congress designed is ineffectual because defendant commission is an arm of the state of Wisconsin and is entitled to Eleventh Amendment immunity. That Congress chose an unconstitutional remedy does not change the result in these cases. Under *Seminole,* this court is also prevented from "rewrit[ing] the statutory scheme in order to approximate what [I] think Congress might have wanted." *See Seminole,* 517 U.S. at 76, 116 S.Ct. 1114.

## II. MOTION TO DISMISS

Although I conclude that defendant commission is entitled to Eleventh Amendment immunity and that jurisdiction is lacking to proceed in this matter against defendant commission members pursuant to *Ex parte Young,* the effect of these conclusions on this case has not been addressed thoroughly by the parties. It is inappropriate to rule on defendants' motion to dismiss until the following issues are resolved.

In *Wisconsin Dept. of Corrections v. Schacht,* —— U.S. ——, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998), the Supreme Court held:

A state's proper assertion of an Eleventh Amendment bar after removal means that the federal court cannot hear the barred claim. But that circumstance does not destroy removal jurisdiction over the remaining claims in the case before us. A federal court can proceed to hear those other claims.

*Id.* 118 S.Ct. at 2054. Under *Schacht* it appears that defendants' entitlement to Eleventh Amendment immunity does not divest this court of subject matter jurisdiction.

Although defendants are entitled to be dismissed from the proceedings, *Schacht* suggests that the underlying disputes concerning whether the interconnection agreements are in violation of federal law may proceed among the parties to the various agreements. (Some of the plaintiffs argue that this court has subject matter pursuant to § 252(e)(6), but it is uncertain whether they are arguing that this section permits these actions to move forward in a manner consistent with *Schacht. See* Pls. Br. in Opp'n to Mot. to Dismiss, Case No. 98–C–0366–C, dkt. # 57, at 13.) Also, some of the cases involve supplemental state law claims. It is conceivable that the dismissal of defendants will not affect the court's jurisdiction to entertain them, although the parties may have to be realigned.

However, before proceeding in this fashion, it is necessary to determine whether the commission is an indispensable party to these cases. If it is, the cases may have to be dismissed in their entirety pursuant to Fed. R.Civ.P. 19(b).

Last, defendants suggest that the proper resolution of these cases is for them to be remanded for judicial review in state court. Although this remedy is plainly contrary to § 252(e)(4), which preempts state court judicial review, defendants note that some of the plaintiffs have filed actions in state court.

The parties will be required to address these issues in supplemental briefing. A status conference will be held on Thursday, December 3, 1998 at 10:30 a.m. before United States Magistrate Judge Stephen Crocker for the purpose of setting a briefing schedule. The parties will be required to appear in person. Telephone appearances are impractical because of the number of parties involved. A decision on defendants' motions to dismiss will be stayed pending completion of supplemental briefing.

### ORDER

IT IS ORDER that a status conference will be held in these actions on Thursday, December 3, 1998, at 10:30 a.m. before United States Magistrate Judge Stephen Crocker

in Courtroom 250, at the Robert W. Kastenmeier Courthouse, Madison, Wisconsin.