MCI TELECOMMUNICATIONS CORPORATION, a Delaware Corporation, and MCI Metro Access Transmission Services, Incorporated, a Delaware Corporation, Plaintiffs–Appellees,

and

United States of America and Federal Communications Commission, Intervenors–Appellees,

v.

ILLINOIS COMMERCE COMMISSION, Terry Harvill, Ruth K. Kretschmer, in their official capacities as Commissioners of the IL Commerce Commission, et al., Defendants–Appellants.

Illinois Bell Telephone Company, doing business as Ameritech Illinois, Plaintiff–Appellee,

and

United States of America and Federal Communications Commission, Intervenors–Appellees,

v.

Terry Harvill, Richard Kolhauser, Ruth K. Kretschmer, in their official capacities as Commissioners of the Illinois Commerce Commission and not as individuals, et al., Defendants–Appellants.

Nos. 98–2127, 98–2256.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 6, 1998.

Decided Feb. 10, 1999

Amended June 23, 1999*.

---

* This opinion was originally released in types- cript form.

Darryl M. Bradford, Jenner & Block, Chicago, IL; Paul M. Smith, Jenner & Block, Washington, DC, for MCI Telecommunications Corp. and MCI Metro Access Transmission Services, Inc.

John P. Kelliher, Office of the Attorney General, Illinois Commerce Com'n, Chicago, IL, for Illinois Commerce Com'n, Dan Miller, Ruth K. Kretschmer, Richard E. Kolhauser, Karl A. McDermott, Edward C. Hurley.

Thomas R. Stanton, Illinois Commerce Com'n, Chicago, IL, for Richard Mathias, Terry Harvill in Nos. 98-2127 and 98-2256.

Mark Stern, Susan L. Pacholski, Dept. of Justice, Civil Div., Appellate Sec., Washington, DC, for Intervenor–Appellee U.S.

Susan L. Pacholski, Dept. of Justice, Civil Div., Appellate Sec., Washington, DC, for Intervenor–Appellee Federal Communications Com'n.

Paul M. Smith, Jenner & Block, Washington, DC, Theodore A. Livingston, Mayer, Brown & Platt, Chicago, IL, for Illinois Bell Telephone Co.

Thomas R. Stanton, Illinois Commerce Com'n, Chicago, IL, for Dan Miller, Richard Kolhauser, Ruth K. Kretschmer, Karl A. McDermott and Brent S. Bohlen in No. 98-2256.

John P. Kelliher, Office of the Attorney Gen., Illinois Commerce Com'n, Chicago, IL, for Edward C. Hurley in No. 98-2256.

Before RIPPLE, KANNE and DIANE P. WOOD, Circuit Judges.

RIPPLE, Circuit Judge.

The plaintiff telephone companies brought this action against the Illinois Commerce Commission and various individual Commissioners. The companies alleged violations of the Telecommunications Act of 1996 in connection with the defendants' arbitration and approval of the companies' interconnection agreements.[1] The defendants now seek review of the district court's denial of their motions to dismiss each case on Eleventh Amendment grounds. For the reasons set forth in the following opinion, we affirm the judgment of the district court in 98–2127.[2]

# I

# BACKGROUND

## A. The Statutory Scheme

Congress enacted the Telecommunications Act of 1996 ("the Act") "[t]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub.L. No. 104–104, 110 Stat. 56, 56 (1996). The Act seeks to introduce competition into local telephone service markets by ending the historic monopoly held by incumbent local exchange carriers ("LECs"). Congress recognized that, even after the removal of regulatory restrictions on competition, significant economic barriers would remain to block entry into local telephone markets. Prospective market entrants would face the cost of duplicating an incumbent provider's local network infrastructure. To remove this economic barrier, the Act essentially requires incumbent LECs to share their networks with competitors. Section 251 of the Act requires incumbent LECs to allow new entrants to interconnect with existing local networks, to lease elements of existing local networks at reasonable rates, and to purchase the incumbents' services at wholesale rates and resell those services to retail customers. See 47 U.S.C. § 251.

Section 252 sets out the process by which incumbent LECs and prospective carriers establish interconnection agreements. First, incumbent LECs and prospective carriers must negotiate in good faith to reach voluntary interconnection agreements. At any time during the negotiations, a party may ask a state commis-

1. By order of this court, *AT & T Communications v. Illinois Bell* (Case No. 98–2566), originally a part of this consolidated appeal, has been remanded to the district court to permit the district court to grant voluntary dismissal to AT & T.

2. This opinion was originally issued on February 10, 1999. In its petition for rehearing in 98–2256, the Illinois Commerce Commission parties noted a factual inaccuracy in our opinion. This case did include interconnection agreements made through private negotiations without mediation or arbitration by a state commission. We therefore amend the opinion to reflect this misstatement. As noted in the text of this amended opinion, this correction does not alter the result in this case. During the pendency of the petition for rehearing, Ameritech filed a motion requesting that we remand case 98–2256 to the district court so that it may be dismissed voluntarily with prejudice. We have granted that motion and therefore need not address the applicability of the Eleventh Amendment to litigation involving such privately negotiated agreements. We note, moreover, that the argument that the Illinois Commerce Commission parties made in the petition for rehearing was not presented with sufficient specificity in their brief before this court.

sion to participate as a mediator in the negotiations. *See* 47 U.S.C. § 252(a)(2). If negotiations prove unsuccessful, subsection 252(b) provides for compulsory arbitration of any open issues. During the period from the 135th to the 160th day after an incumbent LEC receives a request for negotiation, any party to the negotiation may petition a state commission to arbitrate any open issues. Sections 251 and 252 establish certain standards that the state commission must follow in resolving open issues by arbitration and in imposing conditions on the parties. The state commission is also bound by FCC regulations issued pursuant to § 251.

Subsection 252(e) requires any interconnection agreement reached by negotiation or arbitration to be submitted to the state commission for approval and specifies the grounds on which a state commission can reject an agreement. Subsection 252(e)(5) further provides that, if a state commission fails to carry out any of its responsibilities under this section, then the FCC will preempt the state commission's jurisdiction, assume responsibility for the proceeding, and act for the state commission in carrying out its functions.

An implementing regulation to § 252 provides that a state commission "fails to act" for purposes of subsection 252(e)(5)—thus prompting the FCC to step in and assume the state commission's responsibilities—if it fails to respond within a reasonable time to a request for mediation or a request for arbitration, or if it fails to complete an arbitration within the established time limits. *See* 47 C.F.R. § 51.801. A state commission will not be deemed to have failed to act, however, if it merely fails to approve or reject an agreement within the established time limits. *See id.* In such a case, the agreement will be deemed approved. *See* 47 U.S.C. § 252(e)(4).

Therefore, subsections 252(e)(4) and (e)(5), taken together and read in conjunction with the FCC regulation, create a scheme that provides regulatory oversight of interconnection agreements, either by a state commission or by the FCC in its place. Only one scenario, not present in this case, appears to be an exception to this scheme: when the parties reach a voluntarily negotiated agreement without any request for mediation or arbitration and the state commission fails to act to approve or reject the agreement. When these two circumstances occur, the resulting agreement will be deemed approved by the state commission, *see* § 252(e)(4); the FCC will not step in to assume the approval function. In all other cases, either a state commission or the FCC will exercise regulatory oversight over the interconnection agreement process.

Finally, subsection 252(e)(6), titled "Review of state commission actions," provides that whenever a state commission fails to act, the exclusive remedies for that failure to act will be proceedings by the FCC and any judicial review of the FCC's actions. It further provides that "[i]n any case in which a state commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and this section."

### B. The Litigation in the District Court

MCI filed suit against the Illinois Commerce Commission and various individual Commissioners in their official capacities. It alleged that they had violated certain sections of the Act when conducting arbitration proceedings and approving the terms of MCI's interconnection agreement with Ameritech. In the *MCI* case, Ameritech filed a cross-claim against the Commissioners asserting a similar claim. Ameritech also filed its own action against the Commissioners challenging their approval of two negotiated agreements between Ameritech and other telecommunications carriers. MCI and Ameritech sought declaratory and other equitable relief.

The defendants moved to dismiss the plaintiffs' claims on Eleventh Amendment sovereign immunity grounds. The defendants argued that the Act could not abrogate the states' immunity. They also submitted that Illinois had not explicitly authorized waiver of its immunity through any statute or constitutional provision. The defendants further contended that their participation in the arbitration and review process under the Act did not constitute waiver of sovereign immunity because no provision of the Act required the state to submit to suit as a condition for exercising the authority granted it.

The plaintiffs argued that Congress had conditioned state commissions' participation in the arbitration and approval process on their submission to federal court jurisdiction. Thus, they argued, the defendants waived any Eleventh Amendment immunity when they elected to implement the federal regulatory scheme set forth in the Act with full knowledge that their determinations would be reviewable exclusively in federal court.

In reply, the defendants reemphasized that the Act contains no specific language expressly conditioning state commission participation in the regulatory process on consent to suit in federal court. Rather, they contended, the Act provides only for federal court review of the agreements themselves.

## C. Holding of the District Court

In denying the motions to dismiss, the district court determined that the defendants constructively had waived their Eleventh Amendment immunity and, in the alternative, that there was no Eleventh Amendment barrier because of the doctrine of *Ex parte Young*.

### 1.

The district court first determined that *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), had not invalidated the doctrine of implied waiver. In the court's view, although

*Seminole Tribe* restricted Congress' ability to abrogate directly the states' sovereign immunity, the Court's decision left untouched the "unremarkable and completely unrelated" doctrine of waiver. R.59 at 11 (quoting *Seminole Tribe,* 517 U.S. at 63, 116 S.Ct. 1114) (internal quotation marks omitted). The district court then concluded that the defendants had participated voluntarily in the regulatory scheme established by the Telecommunications Act because the Act provided states with the option to arbitrate and to approve the interconnection agreements themselves or, instead, to let the FCC perform that function. Additionally, the district court noted, Congress had made it expressly clear in subsection 252(e)(6) that, if a state opts to participate in the regulatory scheme, its actions are reviewable in federal court. Thus, by participating—voluntarily—in the arbitration and approval process, the defendants had waived immunity from suit in federal court.

### 2.

In the alternative, the district court also held that the doctrine of *Ex parte Young* provides a basis for the defendants' lack of Eleventh Amendment immunity from this suit. The district court first noted that, contrary to the defendants' arguments, the relief sought by the plaintiffs was prospective in nature. The plaintiffs sought not money damages but declaratory and injunctive relief to redress ongoing violations of federal law.

The district court also rejected the defendants' argument that an *Ex parte Young* action is available only when the plaintiffs allege a constitutional (as opposed to statutory) violation. Relying on our decision in *Marie O. v. Edgar,* 131 F.3d 610 (7th Cir.1997), the court held that an *Ex parte Young* action can be brought to vindicate violations of a federal statute.

The district court then concluded that the limitations placed on the *Ex parte Young* doctrine by *Seminole Tribe* and

*Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), did not affect the application of *Ex parte Young* to this case. *Seminole Tribe* limited, the district court acknowledged, the reach of *Ex parte Young* in cases in which Congress has created a detailed and comprehensive remedial scheme. But, held the district court, the Telecommunications Act at issue in this case did not create any such detailed scheme that would limit the type of remedies available to a district court. The district court further held that the narrow exception to *Ex parte Young* created in *Coeur d'Alene* also does not apply to this case. The district court explained that "the issues of sovereign immunity presented by review of state actions taken pursuant to the Telecommunications Act are not nearly as compelling as those presented by the state of Idaho in the dispute over lands that it has historically considered a part of its territory." R.59 at 23.

Finally, the district court rejected the defendants' argument that Congress did not intend to make states parties to the federal suits reviewing interconnection agreements, but instead meant only to provide review of the *agreements* themselves. In rejecting this argument, the district court pointed out that the subsection providing for federal court review was titled "Review of state commission *actions*." R.59 at 25 (emphasis added).

## II

## DISCUSSION

### A. Basic Principles

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

▄ In our decision in *Marie O. v. Edgar*, 131 F.3d 610 (7th Cir.1997), we noted that, although the Eleventh Amendment generally has been interpreted to bar litigation in federal court by private entities against a state, three exceptions to this constitutional bar exist:

First, suits against state officials seeking prospective equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment under the *Ex parte Young* doctrine. *See Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Second, individuals may sue a state directly if Congress has abrogated the state's immunity from suit through an unequivocal expression of its intent to do so and pursuant to a valid exercise of its power. *See Seminole Tribe of Florida v. Florida*, 517 U.S. [44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252] (1996). Finally, individuals may avail themselves of suits against a state that has properly waived its sovereign immunity and consented to suit in federal court. *See id.* at [54–55, 116 S.Ct. 1114]; *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).

131 F.3d at 615 (parallel citations omitted).

### B. Applicability of the Eleventh Amendment

▄ As a threshold matter, the defendants, relying on subsection 252(e)(6), submit that we need not concern ourselves with the application of the Eleventh Amendment because the Telecommunications Act does not even provide for suits against states in federal court, but instead provides only for federal court review of the interconnection agreements themselves. We cannot accept this suggestion; the provisions of the Act, read as a whole, will not permit such a construction and, indeed, make clear that Congress' intent was to the contrary. We believe that the

language in subsection 252(e)(6)—"to determine whether the agreement or statement meets the requirements of section 251 and this section"—does not speak to whether state commissions are to be parties or whether just the agreements may be reviewed, but rather speaks to the scope of the federal court's review. Because subsections 252(e)(3) and (f)(2) allow a state commission to consider state law when approving an agreement, we think it clear that subsection 252(e)(6) includes the "agreement" language quoted above to clarify that federal courts may review a state commission's actions with respect to an agreement only for compliance with the requirements of § 251 and § 252 of the Telecommunications Act, and not for compliance with state law. Moreover, we note that the subsection providing for judicial review is titled "Review of state commission actions," not "Review of interconnection agreements," thus signaling that Congress intended that the state commissions be parties to the federal court suits reviewing their actions, just as the FCC is a party to suits seeking review of its actions.

Subsection 252(e)(4), when read in conjunction with subsection 252(e)(6), provides additional evidence that Congress contemplated suits against state defendants in federal court. Subsection 252(e)(4) provides that "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." This language indicates that Congress envisioned suits reviewing "actions" by state commissions, as opposed to suits reviewing only the agreements themselves, and that Congress intended that such suits be brought exclusively in the federal courts.

## C. Constructive Waiver

The district court first relied upon the doctrine of waiver. We therefore turn to an examination of this basis for affirmance.

### 1.

The defendants first submit that the district court's reliance on constructive waiver

was erroneous because *Seminole Tribe* invalidated the doctrine of constructive waiver. In the view of the defendants, *Seminole Tribe*'s holding that Congress cannot use its Commerce Clause power to abrogate the states' sovereign immunity must also mean that Congress cannot accomplish the same result by forcing constructive waivers of immunity by the states. In support of their position, the defendants rely on two cases that expressed the view that *Seminole Tribe* invalidated the constructive waiver doctrine. *See Chavez v. Arte Publico Press,* 157 F.3d 282, 286–87 (5th Cir.1998), *reh'g en banc granted,* 178 F.3d 281 (5th Cir.1998); *Close v. New York,* 125 F.3d 31, 40–41 (2d Cir.1997).

■ The Supreme Court's decision in *Seminole Tribe* made clear that Congress has limited constitutional power to abrogate the protection afforded the states by the Eleventh Amendment against litigation in federal court. In *Marie O.,* however, we stated that *Seminole Tribe* left intact the "unremarkable, and completely unrelated [to abrogation], proposition that the States may waive their sovereign immunity." 131 F.3d at 617 (quoting *Seminole Tribe,* 517 U.S. at 65, 116 S.Ct. 1114) (internal quotation marks omitted). Our approach is in conformity with the course taken by the majority of circuits in the wake of *Seminole Tribe. See, e.g., Genentech, Inc. v. Regents of Univ. of Cal.,* 143 F.3d 1446, 1453 (Fed.Cir.1998), *cert. granted,* —— U.S. ——, 119 S.Ct. 2388, —— L.Ed.2d ——, 1999 WL 420292 (1999); *Mills v. Maine,* 118 F.3d 37, 50 (1st Cir. 1997); *Booth v. Maryland,* 112 F.3d 139, 145 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998). In each of these cases, the courts proceeded as if the waiver doctrine survives *Seminole Tribe,* although they did not specifically decide the issue. The Ninth Circuit has considered this issue and decided explicitly that *Seminole Tribe* did not affect the doctrine of implied waiver. *See Premo v. Martin,* 119 F.3d 764, 770 n.

2 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1163, 140 L.Ed.2d 174 (1998).[3] Congress may condition a state's receipt of federal funds or participation in a federal program on the state's waiver of its immunity under the Eleventh Amendment, as long as Congress expresses its intent to do so using unmistakably clear language. *See Welch v. Texas Dep't of Highways & Public Transp.,* 483 U.S. 468, 477–78, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987); *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).

As we noted in *Marie O.,* any constructive waiver exacted by the federal government must be based on an "unequivocal indication" of the state's intent to consent to federal jurisdiction that would otherwise be barred by the Eleventh Amendment. Although the doctrine of constructive waiver was not extinguished by the Supreme Court's decision in *Seminole Tribe,* it is clear that "Congress must express, unambiguously, its intent to impose such a condition on the state." *Marie O.,* 131 F.3d at 617. "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

There is, therefore, a fundamental difference between the sort of abrogation that the Supreme Court found constitutionally objectionable in *Seminole Tribe* and the concept of constructive waiver with which we deal in this case. That difference turns on the voluntariness of the state's choice in the waiver situation—a choice between waiving its immunity or forgoing participation in the federal statutory scheme at issue. When Congress gives states a genuine choice, clearly stated, as to whether or not to waive their sovereign immunity, the doctrine of constructive waiver survives *Seminole Tribe.*

We turn now to an application of these principles to the case before us.

### 2.

■ The defendants next submit that, even if the doctrine of constructive waiver survives *Seminole Tribe,* there is no waiver of the State's sovereign immunity in this case. In their view, the Telecommunications Act contains no clear and unambiguous expression of Congress' intent to condition states' participation in the regulatory scheme on their consent to suit in federal court. They point out that the Act does not even mention sovereign immunity; nor does it indicate an intent to give states a choice between carrying out their responsibilities under the Act or retaining their sovereign immunity by letting the FCC fulfill their responsibilities. In their view, the absence of these elements from the statutory language negates any possibility of finding a constructive waiver; there is no textual manifestation that Congress clearly intended to condition the states' participation under the Act on their waiver of sovereign immunity.

We cannot accept this argument. Although the language of the statute might not contain the express waiver language that the defendants seek, the structure of the pertinent section of the statute, notably 47 U.S.C. § 252, makes clear that Congress intended to provide for federal court review of any regulatory determinations made under the section, whether by a state commission or by the FCC acting in the place of a state commission. Section 252 first describes the duties of the carriers seeking to enter an interconnection agreement and then details the role of the state commissions in the mediation, arbitration and review process. It sets forth the standards by which the state commissions may impose terms upon the parties to the interconnection agreements during arbitration as well as the standards by which the state commission must approve

---

**3.** *See also* Kit Kinports, *Implied Waiver After Seminole Tribe,* 82 Minn. L.Rev. 793, 809–21 (1998) (arguing that the doctrine of implied waiver remains valid after *Seminole Tribe*).

or reject an agreement. Subsection 252(e)(5) then provides that, if a state commission fails to carry out its responsibilities under § 252, the FCC will act in place of the state commission. Subsection 252(e)(6), titled "Review of state commission actions," then provides that the exclusive remedy for a state commission's failure to act will be the proceedings before the FCC and any judicial review of the FCC's actions. It further provides that any party aggrieved by a state commission's determination under § 252 may obtain review "in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and [section 252]." 47 U.S.C. § 252(e)(6).

This statutory structure gives each state the option to involve itself in the regulatory scheme or to let the FCC act in its place. Under the terms of § 252, *some* administrative body will exercise regulatory authority over interconnection agreements, and that administrative action, whether taken by a state administrative tribunal or the FCC, is subject to review in federal court. If the reviewing body is a state commission, its actions are reviewable in federal court under 47 U.S.C. § 252(e)(6); if the reviewing body is the FCC, its actions are reviewable in federal court under 28 U.S.C. § 2342. In short, under the Telecommunications Act, Congress gave states a genuine choice: The states could participate in the federal regulatory function delegated to them by the federal government on the condition that their participation be reviewable in federal court; or the states could retain their sovereign immunity and allow the FCC to carry out the federal regulatory functions without their participation. *See* 47 U.S.C. § 252(e)(5)-(6). Because this scheme results in a suit against a state entity in federal court only if the state chooses to participate, the statute involves a constructive waiver—not an abrogation—of the Eleventh Amendment and therefore does not run afoul of *Seminole Tribe.*

We are cognizant of the argument that subsections 252(e)(4) and (e)(5) give rise to a possible scenario in which a state's choice to opt out might arguably be less than voluntary. If parties reach an interconnection agreement through private negotiations (without asking a state commission to mediate or arbitrate) *and* the state commission fails to take action to approve or reject the agreement, the Act provides that such an agreement will be "deemed approved." 47 U.S.C. § 252(e)(4). When an agreement is "deemed approved" under § 252(e)(4), the FCC does not step in to act in place of the state commission. *See* 47 C.F.R. § 51.801. Therefore, in this situation, a state commission arguably must choose between reviewing the agreement (thereby subjecting itself to federal court jurisdiction) or accepting the result that the agreement will go into effect without any regulatory oversight. *See Wisconsin Bell, Inc. v. Public Serv. Comm'n,* 27 F.Supp.2d 1149, 1158, (W.D.Wis.1998). Although the voluntariness of a state's choice to opt out of the process is less clear in such a situation, we do not have this problem before us today. Such agreements are at issue in 98–2256, but we have granted Ameritech's motion to dismiss that appeal and to remand that case to the district court for a voluntary dismissal with prejudice. We therefore need not decide—and reserve for another day—whether having a negotiated agreement go into effect without government oversight is the kind of consequence that leaves a state no true choice but to involve itself in the review process. As this case now comes to us, the defendants affirmatively and voluntarily exercised the choice to involve themselves in the arbitration and approval process while fully aware that the Act provides for federal court review of their actions. Given that the plaintiff carriers had requested arbitration, the FCC would have stepped in had Illinois decided to opt out. *See* § 252(e)(5). Therefore, Illinois did not face a choice between submitting to review in federal court or letting the agreements be implemented without government over-

sight. Thus, without deciding whether a state waives its sovereign immunity by reviewing a privately negotiated agreement, we hold today that, on the record before us, the defendants effectively waived their sovereign immunity by choosing to carry out the arbitration and approval functions as provided in § 252 of the Telecommunications Act.

In sum, the Act provides state commissions with a realistic and genuine choice whether to involve themselves in the regulatory process when asked to arbitrate and approve interconnection agreements, or whether to let the FCC assume those functions. In this case, the defendants exercised that choice voluntarily by opting to participate in the regulatory scheme and thereby consented to suit in federal court.

### Conclusion

We hold that, by electing to assume responsibility for the arbitration contemplated by the Act, the defendants waived the State's immunity from suit in federal court provided by the Eleventh Amendment. Although the wording of the statute does not mention explicitly waiver of sovereign immunity, the structure of the statute, and therefore its operation, make clear that a state's decision to exercise regulatory authority, which would otherwise remain under exclusively federal control, triggers waiver of its sovereign immunity from suit in federal court.[4] Accordingly, the judgment of the district court in 98–2127 is affirmed.

AFFIRMED.

---

4. Because we have decided that the state authorities waived their Eleventh Amendment immunity, we need not address whether the

doctrine of *Ex parte Young* affords an alternate basis for holding that the Eleventh Amendment does not bar this action.