ILLINOIS BELL TELEPHONE COMPANY d/b/a Ameritech Illinois, Plaintiff–Appellant, Cross–Appellee,

v.

WORLDCOM TECHNOLOGIES, INC., as successor in interest to MFS Intelenet of Illinois, Inc., Teleport Communications Group, Inc., MCI Telecommunications Corp. and MCImetro Access Transmission Services, Inc., AT & T Communications of Illinois, Inc., and Focal Communications Corporation, Defendants–Appellees,

and

Dan Miller, Richard Kohlhauser, Ruth Kretschmer, Karl McDermott, and Brent Bohlen, Commissioners of the Illinois Commerce Commission (in their official capacities and not as individuals), Defendants–Appellees, Cross–Appellants.

Nos. 98–3150, 98–3322, 98–4080.

United States Court of Appeals, Seventh Circuit.

Argued May 10, 1999.

Decided June 18, 1999.

As Amended Aug. 19, 1999.

Theodore A. Livingston (argued), Mayer, Brown & Platt, Chicago, IL, for Illinois Bell Telephone Company doing business as Ameritech Illinois, Plaintiff–Appellant in 98-3150, 98-3322, and 98-4080.

Darryl M. Bradford (argued), Jenner & Block, Chicago, IL, Thomas F. O'Neil III, Mark B. Ehrlich, MCI Worldcom Inc., for Worldcom Technologies, Inc., Defendant–Appellee in 98-3150.

Frederick J. Artwick, Sidley & Austin, Chicago, IL, for Teleport Communications Group, Inc., Defendant–Appellee in 98-3150.

Darryl M. Bradford, Jenner & Block, Chicago, IL, Adam H. Charnes, MCI Worldcom Inc., Washington, DC, for MCI Telecommunications Corp., Defendant–Appellee in 98-3150.

John P. Kelliher, Office of the Attorney General, Chicago, IL, Thomas R. Stanton (argued), Illinois Commerce Commission, Chicago, IL, for Dan Miller, Richard Kolhauser, Defendant–Appellees in 98–3150 and 98–3322.

Darryl M. Bradford, John R. Harrington, John J. Hamill, Jenner & Block, Chicago, IL, Richard M. Rindler, Swidler & Berlin, Washington, DC, Adam H. Charnes, Thomas F. O'Neil, III, Mark B. Ehrlich, MCI Worldcom Inc., Washington, DC, for Worldcom Technologies Inc., Defendant–Appellee in 98-3322.

Douglas W. Trabaris, Chicago, IL, for Teleport Communications Group, Inc., Defendant–Appellee in 98-3322.

Darryl M. Bradford, Jenner & Block, Chicago, IL, Darrel Townsley, MCI Telecommunications Corp., Chicago, IL, Adam H. Charnes, Thomas F. O'Neil, III, Mark B. Ehrlich, MCI Worldcom Inc., Washington, DC, for MCI Telecommunications Corp., Defendant–Appellee in 98-3322.

Thomas R. Stanon, Illinois Commerce Commission, Chicago, IL, for Dan Miller, Richard E. Kolhauser, Ruth K. Kretschmer, Karl A. McDermott, Brent S. Bohlen, Defendant–Appellants in 98–4080.

Before BAUER, KANNE, and EVANS, Circuit Judges.

EVANS, Circuit Judge.

Once we determine whether we have jurisdiction (and the scope of that jurisdiction) under the Telecommunications Act of 1996, 47 U.S.C. §§ 251 and 252, what we will have before us today is a rather narrow issue on the merits: whether a decision of the Illinois Commerce Commission regarding reciprocal compensation for telephone connections to Internet service providers violates federal law.

Until the 1990's, local phone service was monopolistic; in fact, many people viewed it as a natural monopoly. Regulation was left to the states. Now, technological advances have taken us far beyond the sort of telephone services parodied by Ernestine.[1] Today, we even have competition in local markets. Through the Telecommunications Act of 1996 Congress has opened the door to competing local exchange carriers and has inserted both the Federal Communications Commission (FCC) and the federal courts into the previously state-regulated monopoly. Just how far into the scheme does the federal presence reach? is the $64,000 question.

Illinois Bell Telephone Company, doing business as Ameritech Illinois (Ameritech) is the incumbent local exchange carrier in Chicago and most of the rest of Illinois. Worldcom Technologies, Inc., Teleport Communications Groups, Inc., MCI Telecommunications Corp., Inc. and MCIMetro Access Transmission Services, Inc., AT & T Communications of Illinois, Inc., and Focal Communications Corporation have, under the Act, recently become competitors with Ameritech for local telephone business. When a competitor builds its own local network it interconnects its facilities with Ameritech so that calls can be made between customers of the two networks. For example, when an Ameritech customer makes a call, the person or entity called may be the customer of another of the carriers; Ameritech bills its customer for the call as a local call. The same is true if a customer of a competing carrier calls an Ameritech customer. If this were all that happened, the carrier whose customer received the call would not be compensated for its part in the transaction. But the 1996 Act provides for "reciprocal compensation" for local calls and it requires companies to establish agreements for intercarrier compensation for the calls. If the call is a local call, then, under the Act in the first example, Ameritech would have to pay reciprocal compensation to the other carrier for "terminating" the call (in the lingo of the industry). In this way, both carriers get money. Ameritech and each of the other carriers have interconnection agreements as required by the Act, 47 U.S.C. §§ 252(b)(5) and 252(d).

Section 252(d) sets out the procedure by which interconnection agreements are to be reached. The carriers must first attempt to negotiate in good faith to reach voluntary agreements. At any time in the negotiations a party may ask a state commission to participate as a mediator. If no agreement is reached, the Act provides for compulsory arbitration of unresolved issues. Any party may petition a state commission to arbitrate the dispute. Furthermore, any agreement reached by negotiation or arbitration must be submitted to the state commission for approval. If a state commission fails to carry out its responsibilities, the FCC will preempt the state commission's jurisdiction and act for the state commission. A state commission's failure to approve or reject an

---

1. Lily Tomlin's character on Rowan and Martin's 1960's TV show, Laugh–In, who with an officious tone and a lot of nasal snorting sat at her switchboard and asked, "Have I reached the party to whom I am speaking?"

agreement, however, is not a failure to act; rather, the agreement will be deemed approved.

The interconnection agreements between Ameritech and each of the other carriers in this case are nearly identical. They became effective in late 1996 and early 1997 and have been approved by the Illinois Commerce Commission (ICC). For a time, the parties routinely paid reciprocal compensation under the agreements.

Trouble arose, however, when Ameritech became concerned that it was paying out more in reciprocal compensation than it was collecting. On July 3, 1997, it sent a letter to the other carriers, claiming that the imbalance was due to their inclusion of calls involving Internet service providers (ISPs) in the requests for reciprocal compensation. Ameritech said that it would no longer pay compensation for calls to Internet service providers because those calls were not local calls. It seems that the other carriers may have been concentrating their marketing on ISPs. The agreements provided for compensation per minute of use, and calls to ISPs are, quite predictably, of long duration.

That is true because Internet service providers are companies which offer their customers connections to the Internet through the telephone network. ISPs are assigned a local telephone number and the telephone companies, including Ameritech, bill their customers for a local call when the customers call ISPs within the local calling area. However, the ultimate connection is usually to a website in a distant location, giving Ameritech a basis for claiming that the calls were not local calls subject to the reciprocal compensation agreements. For reasons we need not get into, Ameritech is not obligated to compensate the carrier of the ISP if the call is deemed to be long-distance, rather than local. In other words, at the present time if a call to an ISP is not subject to reciprocal compensation, the ISP's carrier is not compensated.

Not surprisingly, when Ameritech cut off payments the other carriers filed complaints with the ICC. On March 11, 1998, the ICC ruled in their favor, finding that the plain language of the agreements mandates reciprocal compensation; that there is no basis for treating these calls differently from other local calls. The ICC, in fact, called Ameritech's conduct anticompetitive.

Ameritech filed the present case in the District Court for the Northern District of Illinois, naming as defendants the competing carriers and the Commissioners of the ICC in their official capacity. Ameritech also filed a petition for review of the order in a state court. District Judge David H. Coar, to whom the federal case was assigned, reached a decision, as Ameritech says, "affirming the ICC Order" on July 21, 1998, and entered judgment in favor of the competing companies on August 4, 1998. In entering judgment under Rule 54(b) of the Federal Rules of Civil Procedure, Judge Coar stated:

> This Court has currently pending motions to dismiss the Illinois Commerce Commission [which, correctly labeled, would be a motion of the Commissioners] from this action. Because of the novelty and urgency of the issues presented on the merits of the action and because the Eleventh Amendment issues presented by the Commission's Motions to Dismiss were not related to the merits of the underlying claim, this Court directed the Commission to participate in briefing of the issues on the merits without prejudice to its rights to proceed on its Eleventh Amendment Motions.

On August 25 the motions of the Commissioners to dismiss the action were denied. Before August 25 Ameritech had filed an appeal of the July 21 decision; after the decision on the motions to dismiss, it filed a second notice of appeal naming all defendants; the Commissioners filed a cross-appeal. All three appeals were consolidated.

■ Appellate jurisdiction over the Commissioners is somewhat problematic in that no formal judgment was entered against them. However, it is clear that the Commissioners participated in the litigation on the merits of this action. In entering judgment pursuant to Rule 54(b) on August 4, Judge Coar made it clear that his decision disposed of the merits of the case, but also allowed the Commissioners to continue with their claim that the federal court was a forum in which they did not belong, obviously an issue which should have preceded a decision on the merits. The decision on the motions to dismiss resolved that issue, making the decision on the merits binding on the Commissioners (a decision, of course, going in their favor). It is a situation in which "formal defects in the terminating order do not prevent appeal." *Otis v. City of Chicago*, 29 F.3d 1159, 1165 (7th Cir.1994). *See also Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978). Although we conclude that we have jurisdiction over the appeal as it involves the Commissioners, we are dismayed by this snag and, we might add, by the cursory manner in which Ameritech and the Commissioners treated the issue, despite our order to brief it.

We proceed to the merits. The issue as Ameritech presented it to us is whether the calls to Internet service providers are local calls, subject to reciprocal compensation, or long-distance calls, often interstate. That is the issue which was exhaustively briefed; that, in fact, is the easy issue. But that is not, and cannot be, the issue we decide.

The appeal of the Commissioners of the Illinois Commerce Commission will lead us, however circuitously, to the real issue before us. The Commissioners contend that the federal courts have no jurisdiction over them. Originally they contended that, among other things, sovereign immunity prevents federal courts from exercising jurisdiction over them in their official capacity because in their official capacity they are the Commission, a state entity, and the State of Illinois has not waived its sovereign immunity. That argument is no longer tenable following our recent decision in *MCI Telecommunications Corp. v. Illinois Commerce Commission*, 168 F.3d 315 (7th Cir.1999), in which we determined that the participation of the Commission in the scheme set out in the Act is a waiver of the state's sovereign immunity.

■ Another of the Commissioners' contentions, however, is that the Act, which admittedly provides for some federal court review over some actions of state commissions, does not provide review in this instance. This is an attack on our subject matter jurisdiction. The Commissioners say that the scope of review under § 252(e) is limited to review of an "agreement"; nowhere, they say, is a "federal district court authorized to review an *order* of a state commission, the result of complaints filed with the state commission under state law . . . ."

Section 252(e)(6) says in part:

In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and this section.

The commissioners rely on the word "agreement" and ignore the word "determination" despite the fact that in an earlier order in this case—*Illinois Bell Telephone Co. v. WorldCom Technologies, Inc.*, 157 F.3d 500, 501 (7th Cir.1998)—we said flatly, "Decisions of state agencies implementing the 1996 Act are reviewable in federal district courts." In addition, although the present case arises in a slightly different context, our decision in *MCI* explains the nature of our jurisdiction. We noted that subsection 252(e)(6) provides for judicial review of "state commission actions," not simply review of "interconnection agreements" and that subsection

252(e)(4), when read in conjunction with subsection 252(e)(6), shows that Congress contemplated suits against state defendants in federal court. It provides that "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." We concluded that this language meant that Congress envisioned suits reviewing "actions" by state commissions and that those suits were to be brought exclusively in the federal courts. In addition, we said that Congress intended that the "state commissions be parties to the federal court suits reviewing their actions, just as the FCC is a party to suits seeking review of its actions." At 320.

Of course, the Commission itself is not a party to the action before us even though, in its briefing in this court, Ameritech said that it brought the action to "challenge the ICC Order." Similarly, in its complaint Ameritech said that it was filing the action pursuant to § 252(e)(6) to challenge determinations made by the Illinois Commerce Commission. Even though the Commission is not a named party, the Commissioners themselves acknowledge that, in their official capacity, they are the Commission. We have jurisdiction under § 252(e) to review the actions of the Commission and will proceed on that basis.

But what is the scope of review under § 252(e)? Writing for the Court in *AT & T v. Iowa Utilities Board*, —— U.S. ——, —— n. 10, 119 S.Ct. 721, 733 n. 10, 142 L.Ed.2d 835 (1999), Justice Scalia indicated that the Act was broad federal occupation of territory once belonging to the states and that in turning some "federal policymaking ... over to state administrative agencies," Congress set out a scheme which "is decidedly novel." He continued, "saying that the attendant legal questions, such as whether federal courts must defer to state agency interpretations of federal law, are novel as well," or, as he put it elsewhere, it is a "surpassing strange" setup. At 730 n. 6.

Our view of the scope of review, however, has already been set out in *MCI* in which we indicated that we would review a state commission's action for "compliance with the requirements of § 251 and § 252 of the Telecommunications Act...." We also said that we would not review those actions for compliance with state law. 168 F.3d at 320. The issue before us today, then, is whether the ICC, in determining that under the agreements the parties intended that calls to Internet service providers would be subject to reciprocal compensation, violated federal law.

We have long given deference to the pronouncements of the FCC. *See, e.g., FCC v. National Citizens Committee for Broad.*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); *Illinois Bell Tel. Co. v. FCC*, 740 F.2d 465 (1984). It also appears that none of the telephone companies involved in the present case dispute that deference is in order; in fact, not surprisingly in this instance, everyone thinks the FCC is on its side. That agency is in the process of calling for hearings on proposed rules and will presumably carry out its duty to resolve ambiguities in the statute. *Iowa Util. Bd.*, 119 S.Ct. at 738. But in the absence of a rule, the agency issued a declaratory ruling on February 26, 1999, on the issue of whether calls to Internet service providers are local calls. *See* Declaratory Ruling in CC Docket No. 96–98 and Notice of Proposed Rulemaking in CC Docket No. 99–68 (February 26, 1999). The ruling was issued after the briefing in this appeal and obviously after the agreements at issue here were drafted.

The FCC said

that the communications at issue here do not terminate at the ISP's local server, as CLECs [competing local exchange carriers] and ISPs contend, but continue to the ultimate destination or destinations, specifically at an Internet website that is often located in another state.

Declaratory Ruling at 9 ¶ 12. The FCC declined to separate ISP-bound traffic into two components: an intrastate service go-

ing to the local ISP and a portion, more likely than not to be interstate, going from the ISP to the websites. The conclusion was that ISP traffic for "jurisdictional purposes [is] a continuous transmission from the end user to a distant Internet site." At 11 ¶ 13. This is the part of the ruling which Ameritech likes.

But having determined its jurisdiction, the FCC went on to a discussion of regulation of the calls in the absence of a rule covering compensation for these calls. It is this part of the ruling that the other carriers prefer. Because there is no rule yet promulgated on this issue, the FCC said:

> We find no reason to interfere with state commission findings as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic, pending adoption of a rule establishing an appropriate interstate compensation mechanism.

At 15 ¶ 21. So parties may

> voluntarily include this traffic within the scope of their interconnection agreements under sections 251 and 252 of the Act, even if these statutory provisions do not apply as a matter of law. Where parties have agreed to include this traffic within their section 251 and 252 interconnection agreements, they are bound by those agreements, as interpreted and enforced by the state commissions.

At 15 ¶ 22. Even if ISP traffic is largely interstate, parties may have agreed to treat it as subject to reciprocal compensation or, in fact, a state commission may impose reciprocal compensation in arbitration proceedings:

> A state commission's decision to impose reciprocal compensation obligations in an arbitration proceeding or a subsequent state commission decision that those obligations encompass ISP-bound traffic does not conflict with any Commission rule regarding ISP-bound traffic. By the same token, in the absence of governing federal law, state commissions also are free not to require the

payment of reciprocal compensation for this traffic and to adopt another compensation mechanism.

At 18 ¶ 26.

Now that the FCC has issued its ruling, and noting again that we defer to its reasonable interpretations of the Act, our task is to examine the ICC order, not to determine whether the ICC correctly applied principles of state contract law, but to see whether its decision violates federal law, as set out in the Act or in the FCC's interpretation.

The short answer is that it does not. The FCC could not have made clearer that in the absence of a rule, a state agency's interpretation of an agreement so as to require payment of reciprocal compensation does not necessarily violate federal law.

The agreements here provide:

> Reciprocal Compensation applies for transport and termination of Local Traffic billable by Ameritech or [the other carrier] that a Telephone Exchange Service Customer originates on Ameritech's or [the other carrier's] network for termination on the other Party's network.

All the contracts contain the following definition, " 'Reciprocal Compensation' is As Described in the Act." In the contracts with AT & T, Focal Communications Corporation, Worldcom Technologies, Inc., MCIMetro Access Transmission Services, another relevant definition is " 'Local Traffic' means a call the distance of which is fifteen (15) miles or less as calculated by using the V & H coordinates of the originating NXX and the V & H coordinates of the terminating NXX or as otherwise determined by the FCC or Commission for purposes of Reciprocal Compensation. . . ." The "Commission" referred to is the Illinois Commerce Commission. The contract with Teleport Communications Group provides that " 'Local Traffic' means local service area calls as defined by the Commission," which again is the ICC.

The ICC concluded that the agreements unambiguously provide that:

> reciprocal compensation is applicable to local traffic billable by Ameritech. Since Ameritech Illinois currently charges end users local service charges when completing calls that terminate at the complainants' ISP customers, the plain reading of the interconnection agreements inevitably leads to the conclusion that reciprocal compensation charges should apply to those calls.

ICC order dated March 18, 1998, at 11.

Ameritech attacks this conclusion primarily by stating that the Act does not require reciprocal compensation; the agreements precisely track the Act (reciprocal compensation is "as described in the Act"); therefore the agreements cannot require reciprocal compensation for calls to ISPs.

The syllogism is an oversimplification. That the Act does not *require* reciprocal compensation for calls to ISPs is not to say that it *prohibits* it. The Act simply sets out the obligations of all local exchange carriers to provide for reciprocal compensation: "Reciprocal compensation. The duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications." § 251(b)(5). Then in § 252(d)(2) state commissions are instructed that terms and conditions for reciprocal compensation are not to be considered reasonable unless they provide "for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier" and that the costs be determined on the basis of a "reasonable approximation of the additional costs of terminating such calls." The Act clearly does not set out specific conditions which one party could enforce against the other. The details are left to the parties, or the commissions, to work out.

The ICC's conclusion—that reciprocal compensation should apply to traffic Ameritech bills as local traffic—does not violate the Act or the FCC's interpretation of the Act. In fact, the Commission was doing what it is charged with doing in the Act and in the FCC ruling. It was determining what the parties intended under the agreements. The FCC sets out factors which the state commissions may consider in evaluating the parties' intentions, concluding that the factors are illustrative only and that state commissions, not the FCC, are the arbiters of what factors are relevant in the determination. At 15 ¶ 24.

Predictably, however, Ameritech questions the ICC's determination regarding the parties' intentions. Ameritech contends that the agreements were negotiated against a backdrop of a long-standing FCC policy that ISP traffic is not local traffic. But that contention is shaky. In fact, the FCC recognized that agreements negotiated prior to the February ruling, as the ones at issue here were, were negotiated in the "context of this Commission's long-standing policy of treating this traffic as local, and the conduct of the parties pursuant to those agreements." At 15 ¶ 24. Undeterred, Ameritech points to prior statements and actions of the FCC, which could be interpreted as at least hinting that such traffic may ultimately be considered interstate. One such factor is that ISPs have long had an exemption from paying access fees for their connections to distant websites. The argument is that there would be no need for an exemption were the calls not interstate. Ameritech also relies heavily on *In re GTE Telephone Operating Cos.; GTOC Tariff No. 1*; GTOC Transmittal No. 1148, CC Docket No. 98–79 (F.C.C. Oct. 30, 1998), and to a lesser degree on *In re Bell Atlantic, Tel. Cos.; Bell Atlantic Tariff No. 1; Bell Atlantic Transmittal No. 1076*, CC Docket Nos. 98–168 et al. (F.C.C. Nov. 30, 1998), for the proposition that Internet traffic terminates on the Internet, not at the local server. Consequently, Ameritech says, "Internet traffic is not subject to reciprocal compensation under the Agreements or

federal law." It is only in a footnote in its brief filed December 23, 1998, that Ameritech acknowledges another statement, in our view an important statement, made by the FCC. We quote from *GTE*:

> This Order does not consider or address issues regarding whether local exchange carriers are entitled to receive reciprocal compensation when they deliver to information service providers, including Internet service providers, circuit-switched dial-up traffic originated by interconnecting LECs.

At 1–2 ¶ 2. Also, in *GTE*, the FCC announced its attention to issue a separate order on reciprocal compensation issues, a reference, of course, to the February ruling. Putting aside the obvious fact that both *GTE* and *Bell Atlantic* were issued after the agreements in this case and so are not relevant to what the parties had in mind at the time of the negotiations, it seems clear that the FCC would not agree with Ameritech that it has had a long-standing policy against treating calls to ISPs as local calls.

There is nothing in the FCC ruling on reciprocal compensation which would prohibit a call from being a local call for some, but not all, purposes. The ICC considered relevant factors in evaluating the agreements, including the situation at the time the agreements were negotiated. Other relevant factors are that Ameritech's customers do not pay toll charges for calls to their ISP; Ameritech bills the customer for a local call. Customers dial a local number. The calls are routed over local lines, not long-distance lines. Also quite telling from our point of view is that in the agreements, the parties specifically granted to the ICC the right to define local traffic for reciprocal compensation purposes.

The FCC could not have made clearer its willingness—at least until the time a rule is promulgated—to let state commissions make the call. We see no violation of the Act in giving such deference to state commissions; in fact, the Act specifically provides state commissions with an important role to play in the field of interconnection agreements. Additionally, the ICC is in the mainstream of thought on the issue. Not that the majority rules in these matters, but the commissions in well over half the states have made the same determination that the ICC made, including some interpretations made after the February ruling. In short, nothing in what the ICC said violates federal law in existence at this time. We affirm the decision of the district court affirming the order of the Illinois Commerce Commission.